IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § § | MDL-1446 |
| MARK NEWBY, ET AL., | § § | |
| Plaintiffs | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-3624 CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § § | |
| Defendants | § | |
| AMERICAN NATIONAL INSURANCE COMPANY, et al., | § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. G-02-0299 |
| J.P. MORGAN CHASE & COMPANY, | § § | |
| Defendant. | § § | |

**OPINION AND ORDER**

Pending before the Court in G-02-0299 is Defendant JPMorgan Chase & Co.'s[1] partial motion to dismiss Plaintiffs American National Insurance Company, American National Investment Accounts, Inc., SM&R Investments, Inc., American National Property and Casualty Company, Standard Life and Accident Insurance Company, Farm Family Life Insurance Company, Farm Family Casualty Insurance Company, and National Western Life Insurance Company's (collectively, "Plaintiffs'") Second Amended Complaint (instrument #29), pursuant to Federal Rule of Civil Procedure 12(b)(6), to the

---

[1] The Court uses Defendant's spelling of its name.

extent that it includes claims for damages arising from Plaintiffs' alleged "holding" of Enron securities.[2]

In relevant part, Plaintiffs' Second Amended Complaint alleges that from 1997 until Enron filed for bankruptcy, JPMorgan Chase, conspiring with Enron to sustain its purported *Ponzi* scheme, made misrepresentations about Enron's financial strength in analyst reports "that were reiterated in general-circulation financial news outlets" and participated in various specific financial transactions with Enron with the purpose of committing fraud. #25 at 40, ¶ 189. Plaintiffs claim that they relied upon Enron's financial statements filed with the SEC, which JPMorgan's illegitimate transactions in support of Enron's alleged scheme helped to falsify, and on information from financial information services, such as Bloomberg. The Second Amended Complaint complains that "Plaintiffs were harmed because Defendant never downgraded its recommendations" to warn them to consider whether "to buy or hold Enron securities." #25 at 39-40, ¶ 188; *id.* at 41-42 ¶¶ 196-98. Plaintiffs seek as statutory damages the difference between the amount or consideration paid for the Enron securities and (a) the true market value of such securities at the time of purchase (i.e., had there been no misrepresentation); or (b) the net amount received upon their sale." #25 at 55, ¶ 263. "In addition or in the alternative, Plaintiffs suffered actual damages and losses in the following respects: (a) Loss or diminution of principal invested; (b) Loss of investment

---

[2] Plaintiffs also bring non-holder claims, but they are not at issue in the motion for summary judgment.

opportunity; (c) Loss of earnings (including lawful interest); and, (d) Commissions or fees incurred by way of investment in Enron securities." *Id.* at ¶ 264.  It identifies, as Plaintiffs' causes of action, violations of the Texas Securities Act, Tex. Rev. Civ. Stat. art. 581-1 *et seq.*, especially Article 581-33F; statutory fraud under the Texas Bus. & Comm. Code § 27.01; and common law fraud and conspiracy to commit fraud.[3]

At issue here is a legal question, i.e., whether holder claims[4] are cognizable under Texas common law, here specifically fraud and conspiracy to commit fraud.  If they are, is Plaintiffs' claim a derivative claim belonging to the corporation or an individual claim.

---

[3] The statutes do not apply to holder claims because the Texas Securities Act, § 581-33(A)(2), by its own language expressly relates only to securities that are offered or sold by means of an untrue statement or omission of material fact, while § 27.01 of the Texas Business and Commerce Code covers actual transactions involving stock, e.g., false representations "made to a person for the purpose of inducing that person to enter into a contract; and relied on by that person in entering into that contract." *See also Barsky v, Arthur Andersen, LLP.*, Civ. No. A H-02-1922, 2002 WL 32856818, at *2 n.3 (S.D. Tex. Aug. 16, 2002)(noting that plaintiff observed that "both the Texas Securities Act and Texas Business and Commerce Code § 27.01 require a purchase or sale, while the latter also requires that a contract be entered into as a result of the misrepresentation.  Thus actions based on holding stock cannot be brought under them.").

[4] In a holder claim, the plaintiff/securities holder alleges that the defendant wrongfully induced the plaintiff to continue holding his stock and seeks as damages the diminished value of the stock allegedly caused by the defendant's misrepresentation.  While not permissible in federal court some state courts have allowed holder claims to be brought under common law fraud, although actual reliance is a required element.

## Standard of Review

Dismissal under Rule 12(b)(6), a disfavored remedy, should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 164 (5th Cir. 1999), *quoting Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In reviewing a motion under Rule 12(b)(6), the court must accept all well pleaded facts as true and view them in a light most favorable to the plaintiff. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). The Court should not accept conclusory allegations or unwarranted deductions of fact as true, nor legal conclusions masquerading as factual allegations. *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994); *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). The issue is not whether the plaintiff will prevail, but whether he is entitled to pursue his claims and offer evidence in support of them. *Doe v. Hillsboro I.S.D.*, 81 F,3d 1395, 1401 (5th Cir. 1996). The Court is limited to the pleadings in resolving the motion and may not look beyond them. *Baker v. Putnal*, 73 F.3d at 196.

"Property interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55 (1979). Whether a claim is derivative or direct is a matter of state law. *Crocker v. FDIC*, 826 F.2d 347, 349 (5th Cir. 1987)("State law determines whether a shareholder may maintain a nonderivative action."), *cert. denied*, 485 U.S. 905 (1988). Because this Court's jurisdiction is based on "related to" bankruptcy jurisdiction, the

Court points out that in the absence of a compelling federal interest, bankruptcy courts apply state law to determine the existence and scope of the debtor's interest in property. *Butner*, 440 U.S. at 55; *Vanston Bondholder Protective Committee v. Green*, 329 U.S. 156,, 161-62 ("What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law" in the bankruptcy court).

Although various courts apply different choice-of-law analyses, the Fifth Circuit has determined that a federal court may apply the forum state's choice of law rules "or may exercise its independent judgment and choose whatever state's substantive law it deems appropriate." *Woods-Tucker Leasing Corp. v. Hutcheson-Ingram Dev. Co.*, 642 F.2d 744, 748 (5th Cir. 1981); *FDIC v. Lattimore Land Corp.*, 656 F.2d 139, 150 n. 16 (5th Cir. 1981).

Under Texas choice-of-law rules, in tort actions "the law of the state with the most significant relationship to the particular substantive issue controls."[5] *Schneider v. Nat.*

---

[5] Under the "most significant relationship" test, the court must weigh the following factors: (1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the relevant policies of other interested states and the relative interests of those states in the resolution of the specific issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability, and uniformity of result; and (7) ease in determination and application of the law to be applied. In tort actions, (4), (6), and (7) are of less significance. Restatement (Second) of Conflicts §§ 6(2) and 148(2) cmt. b (1971); *Vanderbilt Mortgage & Finance Inc. v. Posey*, 146 S.W. 3d 302, 314 (Tex. App.--Texarkana 2004). Here the injury occurred in Texas and the wrongful conduct involving Enron that allegedly caused the injury

*Transport v. Ford Motor. Co.*, 280 F.3d 532, 536 (5th Cir. 2002), *citing W.R. Grace & Co. v. Continental Cas. Co.*, 896 F.2d 865, 873 (5th Cir. 1990); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984); and *Gutierrez v. Collins*, 583 S.W. 2d 312, 318-19 (1979).[6]  *See also Red Roof Inns. inc. v. Murat Holdings, L.L.C.*, ___ S.W.3d _____, No. 05-05-00240, 2006 WL 2458563, *5 (Tex. App.–Dallas Aug. 25, 2006), *citing* Restatement (Second) of

---

occurred in large part in Texas, the needs of interstate and international systems, of which there is no evidence in the record, are not of import; Texas has a strong policy interest in regulating businesses that voluntarily chose to do business within its borders; because Texas has the most significant contacts here, the policies of other interested states are not important here, nor is there evidence of conflict; JPMorgan Chase should have expected the application of Texas law while doing business in Texas; and this Court is clearly capable of applying Texas law.  "The most basic tenet of tort law is deterring individuals and entities from injuring others, be the injury physical, emotional, or economic, as well as making injured victims of torts whole.  If [JPMorgan Chase] made omissions in Texas, then Texas has an interest in seeing the injuries caused by those omissions are remedied." *Clear Entertainment*, 2000 WL 819606, at *2.

[6] Because this Court's "related to" bankruptcy jurisdiction would stem from the bankruptcy court in the Southern District of New York, where Enron filed for bankruptcy, the Court notes that New York choice-of-law rules require the court to apply the law of the jurisdiction with the greater interest in having its law applied, as determined by evaluating facts or contacts that relate to the purpose of the law at issue. *Ackerman v. Price Waterhouse*, 252 A.2d 179, ___, 683 N.E.2d 179, 192 (N.Y.A.D., 1 Dept. 1998); *Frink America, Inc. v. Champion Road Machinery Ltd.*, 48 F. Supp. 2d 198, 205 (N.D.N.Y. 1999).  "[T]he most significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Frink America*, 48 F. Supp. 2d at 205 (and cases cited therein).  Where relevant state laws are in conflict, "'the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Id., citing Ackerman*, 683 N.Y.S. 2d at 189.  Here Plaintiffs are business entities, many with principal places of business in Galveston County, Texas, and the Second Amended Complaint asserts that "a substantial portion of the complained-of acts and omissions occurred in Galveston County." #24

Conflict of Laws §§ 6, 145,[7] 148(1)[8] (1971).  *See also Vanderbilt Mortgage & Finance Inc. v. Posey*, 146 S.W. 3d 302, 314-15 (Tex. App.--Texarkana 2004); *Clear Entertainment, L.L.C. v. KPMG, L.L.P.*, No. 3:99-CV-2518-X, 2000 WL 819406, *1 (N.D. Tex. June 12, 2000).

There is no dispute or conflict about the application of Texas law here.

As the Fifth Circuit summarized in *Hulin v. Fibreboard Corp.*, 178 F.3d 316, 318-19 (5th Cir. 1999), in what has been dubbed an "*Erie* guess,"[9] when a federal court

> determin[es] the content of the state law to
> be applied . . . the underlying substantive
> rule involved is based on state law and the

---

[7] Section 145(2)lists specific factors for consideration in tort actions:  (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicil, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *Vanderbilt*, 146 S.W. 3d at 314-15.  The injury to Plaintiffs occurred in Texas; many of the parties are domiciled in Texas and/or conduct substantial business here; and substantial portion of the alleged wrongful conduct with Enron occurred here; and the relationship among the parties is centered here.

[8] Section 148(1) specifically applies to misrepresentations. It provides that when the representation was made and received in the same state and plaintiffs relied on the misrepresentation and suffered pecuniary injury in the state also, that state's law applies.

[9] After *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)("Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State.").  Where the state's highest court has not ruled on the issue, as the Texas Supreme Court has not determined whether holder claims are cognizable under common law fraud or whether they are derivative or direct claims, the court "must make an *Erie* guess as to what the Texas Supreme Court would most likely decide." *Herrmann Holdings, Ltd. v. Lucent Technologies, Inc.*, 302 F.3d 552, 558 (5th Cir. 2002).

State's highest court is the best authority
on its own law.  If there be no decision by
that court then federal authorities must
apply what they find to be the state law
after giving "proper regard" to relevant
rulings of other courts of the State.
*Commissioner v. Estate of Bosch*, 387 U.S.
456, 465 . . . (1967); *see also id.* at 477,
. . . ("[A]bsent a recent judgment of the
State's highest court, state cases are only
data from which the law must be derived . .
. ." (Harlan J, joined by Fortas, J.
dissenting)).  *See, e.g., Jackson v, John-
Manville Sales Corp.*, 781 F.2d 394, 397-98
(5th Cir.)(en banc)(In filling a void in state
law, the federal court may not do merely what
it thinks best, but rather must do what it
thinks the state's highest court would deem
best.), *cert. denied*, 478 U.S. 1022  . . .
(1986); *Rogers v. Corrosion Prods., Inc.*, 42
F.3d 292, 295 (5th Cir.)(Although "[t]he
decisions of lower state courts should be
given some weight, . . . they are not
controlling where the high state court has
not spoken on the subject."), *cert. denied*,
515 U.S. 1160 . . . (1995); *Roginsky v.
Richardson-Merrell, Inc.*, 378 F.2d 832, 851
(2d Cir. 1967)("[W]hen a federal court must
determine state law, it should not slavishly
follow lower or even upper court decisions,
but ought to consider all the data the
highest court of the state would use.")[10]; 19
[C]harles Alan Wright, et al., Federal
Practice and Procedure § 4507, at 12 (2d ed.
1996)("[A] responsible determination of state
law involves something more than checking the
digests for state court decisions on
point[.]"); 19 [W]right et al., *supra* at 126-
30 ("[T]he federal court must determine
issues of state law as it believes the
highest court of the state would determine
them, not necessarily (although usually this
would be the case) as they have been decided
by other state courts in the past"); 19
[W]right et al., *supra* at 157 ("Thus,

---

[10] *But see also Herrmann Holdings*, 302 F.3d at 558 ("In making
an *Erie* guess, we defer to intermediate state appellate court
decisions 'unless convinced by other persuasive data that the
highest court of the state would decide otherwise."), *quoting First
Nat'l Bank of Durant v. Trans Terra Corp.*, 142 F.3d 8022, 809 (5th
Cir. 1998).

> intermediate appellate court decisions may be
> disregarded if the federal court is convinced
> by other persuasive data that the highest
> court of the forum state would decide the
> matter in a different fashion." (citing,
> e.g., *Industrial Indem. Co. v. Chapman and
> Cutler,* 22 F.3d 1346, 1355 n. 18 (5ᵗʰ Cir.
> 1994); *Eljer Mfg., Inc. v. Liberty Mut. Ins.
> Co.,* 972 F.2d 805, 814 (7ᵗʰ Cir. 1992), *cert.
> denied*, 507 U.S. 1005 (1993)).

*Hulin v. Fibreboard Corp.*, 178 F.3d at 318-19. In sum, in making

an *Erie* guess in the absence of a ruling by the Texas Supreme

Court, this Court should consider (1) lower state court decisions

and Supreme Court dicta; (2) the general (prevailing) rule on the

issue; (3) the rule in other states looked to by the Texas state

court courts when they formulate the substantive law of Texas; and

(4) other available legal sources, such as treatises and law

review commentaries. *Jackson v. Johns-Manville*, 781 F.2d at 397-

98, *citing Guaranty Trust Co. v. York*, 326 U.S. 99 (1945), and 19

C. Wright, et al., *Federal Practice and Procedure* § 4507 at 100-

03.

## JPMorgan Chase's Motion to Dismiss

Defendant contends that Plaintiffs have improperly

alleged "holder claims," i.e., diminution in value of certain

Enron securities which Plaintiffs had purchased at fair market

price in 1992 and 1993, years before the alleged wrongdoing by

Enron or JPMorgan Chase, and which they neither purchased nor sold

during the period of that alleged wrongdoing. Plaintiffs claim

that they relied on misrepresentations by JPMorgan Chase or Enron

regarding Enron's financial condition in deciding to hold onto

their securities rather than sell them, and that they therefore

lost the chance to sell them at a higher, artificially inflated price and thus suffered damages when Enron collapsed and went into bankruptcy.  JPMorgan argues for dismissal of these claims on the ground that neither Texas common law nor Texas statutory law recognizes a cause of action based on holder claims, i.e., based on a failure to sell securities, nor do Plaintiffs have standing to assert such claims.

Texas law does not recognize holder claims, insists JPMorgan Chase. *Neal v. Smith Barney & Co. Inc. (In re WorldCom, Inc. Sec. Litig.*), Civ. No. 02-3288 (DLC), 2006 WL 752770, at *2-3 (S.D.N.Y. March 24, 2006)(dismissing holder claims because "[t]here is no basis to predict that the Texas Supreme Court would recognize a holder claim that would encompass [Plaintiff's] allegations"; "there is general agreement that holder claims cannot be successfully pleaded under the common law.  The principle deficiency to which courts point is the impediment to proof of damages.").[11]  In sum, Texas has not recognized holder

---

[11] Plaintiffs object that this single case, unpublished and issued by a federal district court in the Southern District of New York, attempting to interpret Texas law, relied on a Texas case that was withdrawn, and its replacement did not reach the issue, but applied Delaware law in reaching a judgment in favor of the defendants.  *Neal*, 2006 WL 752770 at * 2, citing *Shirvanian v. Defrates* ("*Shirvanian I*"), No. 14-02-00447, 2004 Tex. App. LEXIS 182 (Tex. App.-Houston [14th Dist.] 2004)(relying in part on California law), *op. withdrawn*, 161 S.W.3d 102 (Tex. App.-Houston [14th Dist.] 2004, pet. denied)("*Shirvanian II*").  (The Court observes that ironically Plaintiffs rely on the vacated *Shirvanian I* to argue that Texas does recognize holder claims as individual claims.)
    In *Shirvanian I*, the Fourteenth Court of Appeals reversed a summary judgment by the district court that had determined that certain shareholders' holding claims were direct, not derivative, claims under Delaware law because the shareholders had alleged that the fraud had affected them directly.  The district court had

claims under Texas common law in part because the holders seek recovery for an uncertain lost opportunity to capitalize on a defendant's alleged fraud.

JPMorgan Chase maintains that holder claims are purely speculative ("I would have sold if . . . "), and thus raise problems in proving damages, causation and reliance.  #39 at 2. For this reason, argues JPMorgan Chase, such claims have not been allowed by numerous courts, including the United States Supreme Court in *Stamps v. Manor Drug Stores*, 421 U.S. 723, 740-46 (1975)(recognizing the risk of meritless and "vexatious litigation" filed to extort a settlement, posed by holding claims).  Furthermore, such claims seek damages for the generalized injury of the diminished value of the security,

---

concluded that refraining from selling stock was sufficient reliance to sustain a cause of action for fraud.  Plaintiffs explain that shortly after *Shirvanian I* was issued, the Delaware Supreme Court issued *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), creating a test for deciding whether a shareholder's suit was direct or derivative.  *Id.* at 1035 (discarding the special injury test (whether plaintiff/shareholder suffered an injury independent of the injury suffered by shareholders generally), the Delaware Supreme Court held, "The analysis must be based solely on the following questions:  Who suffered the alleged harm--the corporation or the suing stockholder individually--and who would receive the benefit of the recovery or other remedy?").  *See also id.* at 1039 ("The proper analysis has been and should remain that . . . a court should look to the nature of the wrong and to whom the relief should go.  The stockholder's claimed direct injury must be independent of any alleged injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail *without showing an injury to the corporation*." (italics added by the Court)).  Once *Tooley* issued, the Fourteenth Court of Appeals withdrew *Shirvanian I*, which had relied on earlier Delaware law's "special injury" test, and issued *Shirvanian II*, which applied the *Tooley* test.  The panel found the claims were derivative under now settled Delaware law, but never reached the issue of whether the equity holder action should be dismissed for failure to state a claim.  161 S.W.3d at 110-11.

whether it is stock (equity) or bond (debt), common to all holders and necessarily derivative of injury to the debtor corporation. #39 at 2-3.  JPMorgan charges that Plaintiffs not only ignore the unique nature of holder claims, but cite as authority for their arguments cases that do not involve such claims.

In addition, argues JPMorgan Chase, this Court and the Fifth Circuit have dismissed such claims as derivative claims belonging to the corporate issuer's bankruptcy estate, with the diminution in value being an injury to the corporation, not the shareholder.  Where the corporation is in bankruptcy, a claim of injury to the corporation is the property of the debtor's estate, not of the individual plaintiff, and thus individual security holders lack standing to pursue them directly.  *See, e.g., Matter of Educators Group Health Trust*, 25 F.3d 1281, 1283-84 (5th Cir. 1994); *In the Matter of J.R. Canion*, 196 F.3d 579, 583 n.9 (5th Cir. 1999); *see also Crocker v. FDIC*, 826 F.2d 347, 351 (5th Cir. 1987); *Young v. Belfer*, Civ. No. H-04-1546, *Order* (S.D. Tex. Mar. 1, 2005)(instrument #50); *Chinn v. Belfer*, Civ. No. H-03-862, *Opinion and Order* (S.D. Tex. Sept. 12, 2005)(instrument #44); *Barsky v. Arthur Andersen, LLP*, Civ. No. H-02-1922, 2002 WL 32856818, *2-3 (S.D. Tex. Aug. 16, 2002)(instrument #12). JPMorgan identifies a number of other jurisdictions that have either rejected such claims or imposed severe restrictions on them.[12]  #29 at 7.

---

[12] *See, e.g., In re WorldCom Inc. Sec. Litig.*, 336 F. Supp. 2d 310, 319 (S.D.N.Y. 2004)(observing that "Courts in other jurisdictions have rejected common law claims by 'holders' for a variety of reasons"); *Chanoff v. U.S. Surgical Corp.*, 857 F. Supp.

Aside from the legal insufficiency of holder claims, JPMorgan Chase insists that Plaintiffs lack standing to seek the alleged speculative damages[13] because their claim is "derivative," i.e., it derives from an injury to the corporation rather than an injury directly to the shareholder.  *Matter of Educators Group Health Trust*, 25 F.3d 1281, 1284 (5th Cir. 1994)("If a cause of action alleges only indirect harm to a creditor (*i.e.*, an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate.  Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate.").  Where the corporation is in bankruptcy, a derivative claim is the property of the debtor's estate, rather than of the individual plaintiff, and the individual lacks standing to assert the claim.  *Id.* at 1283-84;

---

1011, 1018 (D. Conn. 1994), *aff'd*, 31 F.3d 66 (2d Cir. 1994)(holding that under Connecticut law, "claims for damages based on the plaintiffs' failure to sell or hedge their stock are too speculative to be actionable); *Manzo v. Rite Aid Corp.*, Civ. No. A 18451-NC, 2002 WL 31926606, *5 (Del. Ch. Dec. 19, 2002)(dismissing plaintiffs' claims for "investment opportunity losses" and "benefit of the bargain damages" because they were too speculative to state a claim as a matter of law; also holding that to the extent the claims were for deprivation of accurate information on which to base investment decisions, plaintiff's injury of a poor rate of return on her Rite Aid stock was suffered by all Rite Aid shareholders in their pro rata share ownership and thus was a derivative claim), *aff'd*, 825 A.2d 239 (Del. Supr. 2003).

[13] Plaintiffs counter that JPMorgan Chase admits that debt securities claims are not speculative and that JPMorgan Chase wrongly compares their claims with common stock holder claims.

*In the Matter of J.R. Canion*, 196 F.3d 579, 583 n.9 (5th Cir. 1999); *Weiss v. Northwest Acceptance Corp.*, 546 P.2d 1065, 1069 (Or. 1976).[14]   *See also Barsky*, 2002 WL 32856818 at *3; *Young v. Belfer*, Order #50 at 2 (holding claims are derivative and belong to the debtor's bankruptcy estate); *Chinn v. Belfer*, #44 (finding Plaintiffs' holder claims to be derivative under Oregon[15] and Delaware law).   The Fifth Circuit has also concluded that holder claims are derivative in a case applying Delaware law:  the panel in *Smith v. Waste Management, Inc.*, 407 F.3d 381, 385 (5th Cir. 2005) opined, "[T]he harm that befell [holder plaintiff] Smith-- the drop in share prices caused by untimely disclosure of unfavorable financial date--was a harm that befell all of Waste Management's stockholders equally.   Stated differently, the misconduct alleged by Smith did not injure Smith or any other shareholders directly, but instead only injured them indirectly as a result of their ownership of Waste Management shares."[16]   *See also In re Kevco Inc.*, 113 Fed. Appx. 29, 31 (5th Cir. 2004)(*per curiam*)(extending holding that holder claims are derivative to

---

[14] Title 11 U.S.C. § 541(a)(1) identifies property of the bankruptcy estate as including "all legal or equitable interests of the debtor in property as of the commencement of the case."   The Fifth Circuit observed that  the phrase, "all legal and equitable interests of the debtor in property," has been construed broadly to include causes of action.   *Educators Group*, 25 F.3d at 1283-84.

[15] Enron was incorporated in Oregon.   Under article 8.02 of the Texas Business Corporation Act (Vernon's 2003), with respect to foreign corporations, the rights and duties of directors and stockholders in corporate matters are governed by the laws of the state of incorporation.

[16] Plaintiffs point out that *Waste Management* applied Delaware, not Texas, law, and therefore they do not address the case.

holders of debt), *cert. denied sub nom. PAM Capital Funding L.P. v. National Gypsum Co.*, 544 U.S. 948 (2005).[17]

### Plaintiffs' Response (#38)

Plaintiffs object that their claims are not holder claims and that the JPMorgan Chase did not meet its burden under Rule 12(b)(6) because it failed to address the "full" test in Texas for determining whether a claim is derivative, while distracting the Court with case law that is neither applicable nor binding here.  They maintain that Texas has a long history of permitting fraud claims based upon a plaintiff's injury from inaction.  They insist that Plaintiffs here assert creditor claims that should not be determined by shareholder derivative/direct case analyses, that are unique and personal to Plaintiffs, and that thus cannot be brought by the Enron bankruptcy trustee,[18] and that holder claims are cognizable in Texas.

Insisting the distinction between equity and debt is relevant to the analysis, Plaintiffs argue that their bondholder and preferred stockholder claims are properly analyzed as creditor

---

[17] Plaintiffs insist that *Kevco* cannot be used as authority and is not at all persuasive because it provides no rationale for its decision, no analysis of why the claim was derivative rather than direct, and is "totally inapplicable to and not controlling over Plaintiffs' claims."  #38 at 7 & n.4.  They maintain that its holding is contrary to that in *In re Educators Group Health Trust*, 25 F.3d at 1285.

[18] This Court notes that no trustee was appointed for the Enron bankruptcy estate.  Instead Bankruptcy Judge Arthur Gonzalez appointed Stephen Cooper, a turnaround expert, as Enron's Chief Executive Office and Chief Restructuring officer.  He also appointed Neal Batson as Bankruptcy Examiner to investigate any possible fraud, and he gave the Creditors Committee the authority to sue on behalf of the debtor's estate.

claims, not as common stockholder claims.[19]  They also urge that
Plaintiffs' debt-based claims here are governed by Texas law, not
that of Oregon or Delaware.  They contend that their injury is not
limited to diminution of the value of their securities.[20]  They
also insist that JPMorgan Chase failed to address the fact that
Enron could not have brought Plaintiffs' claims against JPMorgan
Chase at the time Enron filed for bankruptcy because Enron had no
right to assert Plaintiffs' injuries or Plaintiffs' reliance on
JPMorgan Chase's misconduct and conspiracy with Enron; thus the
bankruptcy trustee could not have asserted them either.

        Whether a claim is derivative is determined by each
state's law, and Texas law applies here,[21] insist Plaintiffs.
*Crocker v. Fed. Dep. Ins. Corp.*, 826 F.2d 347, 349 (5th Cir. 1987).
For the proposition that holder claims are cognizable in Texas

---

[19] Plaintiffs state that National Western Life Insurance
Company held two $5 million bonds, Farm Family Life Insurance
Company held one $1 million bond, and Farm Family Life Insurance
Company and Farm Family Casualty Insurance Company held $250.000
each of  preferred stock guaranteed by Enron.  They further argue
that the preferred stock contained more characteristics of debt
than of equity and therefore should be treated as debt for the
analysis at issue.

[20] JPMorgan Chase argues that holder claims seek damages for
the generalized injury of the diminished valued of the security,
regardless whether it is debt or equity, and that such injury is
not only common to all similarly situated security holders, but
derivative of the injury to the corporation.

[21] Plaintiffs argue that to determine whether a claim is
derivative or direct requires a choice-of-law analysis under the
law of the forum state.  *Smith v. Waste Management, Inc.*, 407 F.3d
381, 384 n.1 (5th Cir. 2005)(State law determines whether a
shareholder may maintain a nonderivative action.  Where the suit is
part of a multidistrict litigation subject to multidistrict rules,
"the governing law comes from the 'jurisdiction in which the
transferred case originated.'").  This action was filed in Texas.

under the common law, Plaintiffs cite *Shirvanian v. Defrates* ("*Shirvanian I*"), No. 14-02-00447, 2004 Tex. App. LEXIS 182 (Tex. App.–Houston [14th Dist.] 2004)(relying in part on California law), *op. withdrawn and replaced*, 161 S.W.3d 102 (Tex. App.–Houston [14th Dist.] 2004, pet. denied).[22]  *See also Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1256-57 (Cal. 2003)(holding that California permits a shareholder, who was wrongfully induced to hold a stock rather than sell it, to sue under common law fraud or negligent

---

[22] JPMorgan Chases responds that not only was the *Shirvanian I* decision withdrawn, but it was replaced by one that did not reach the issue of whether holder claims could be brought under Texas common law, and therefore it cannot serve as binding authority. Defendant further emphasizes that the court in *Shirvanian I* highlighted the fact that the case involved an "unusual" factual predicate of plaintiffs who had "direct dealings with the defendants" and who made the alleged misrepresentations directly to the defendants; that "critical feature" of personal contact made it more like an "ordinary case of deceit" than a misrepresentation in the vast public securities markets and limited its holding to a "narrow setting"; the court emphasized that "[t]his type of holding claim will always have a very narrow pool of plaintiffs." 2004 Tex. App. LEXIS 182, at * 55, 58.  The court upheld such claims only where there were "direct, face-to-face or telephone misrepresentations" and where plaintiffs sufficiently asserted that "they had a specific plan to sell their shares at a date certain." *Id.* at 58-59.  Moreover, the plaintiffs were not "'complete bystanders.  The [plaintiffs] were the largest individual shareholders" of the defendant.  *Id.* at 58.  In agreement with JPMorgan Chase's reading of *Shirvanian I* is Judge Cotes' decision in *Neal v. Smith Barney*, 2006 WL 752770 at *3.
    Should the Court adopt *Shirvanian I*, JPMorgan Chase distinguishes the facts here in that "Plaintiffs were 'ordinary' investors in Enron . . . who learned about Enron's financial condition through publicly available information"; they "did not plead any special 'direct' communications" with Enron or JPMorgan Chase; and they did not "allege that they had a specific plan to sell their shares at a date certain." #39 at 6.  Nor, this Court notes, were they by any stretch the largest securities holders in Enron.  In *Neal v. Smith Barney*, Judge Cote examined *Shirvanian I* and concluded that Texas would not recognize holder claims generally, and at most, would do so only where the "narrowly crafted circumstances' in that case were paralleled.  This Court agrees with JPMorgan's interpretation.

misrepresentation, but requires him to allege fraud with
"specificity to show a bona fide claim of actual reliance");
*Rogers v. Cisco Sys., Inc.*, 268 F. Supp. 2d 1305, 1311-12 & n.13
(N.D. Fla, 2003)(predicting that Florida common law would permit
fraud "holding" claim, but not Florida securities laws, but
finding plaintiffs failed to plead reliance with sufficient
particularity).

    With respect to Plaintiffs' claims that they lost the
opportunity to obtain the artificially inflated price, Plaintiffs
contend that  JPMorgan Chase improperly assumes that Plaintiffs
assert derivative, common-stock holder claims, when their holdings
instead were bonds or were preferred stock that shared more
characteristics with debt than with equity.[23]  Plaintiffs purchased
their bonds and preferred stock for a defined income stream, not
to sell at artificially inflated prices.[24]  They argue that whether

---

[23] Plaintiffs explain that preferred stock, a "hybrid"
containing characteristics of both equity and debt, is guaranteed
priority by a corporation's charter over common stock with respect
to the payment of dividends and distribution of assets. #38 at 22.
Whether a particular preferred stock should more properly be
characterized as debt rather than equity is a factual issue not
properly addressed in a Rule 12(b)(6) motion to dismiss. *Id*. It
claims that on summary judgment it will demonstrate, with specified
evidence produced in discovery which the Court will not address
here, that the preferred stock at issue should be characterized as
debt. *Id*. at 22-23. If the Court were to decide they are more in
the nature of equity claims, Oregon law would apply, and Plaintiffs
argue that the claims are not derivative under Oregon law. #38 at
23-25.

[24] JPMorgan responds that a market clearly exists for debt
securities and at different times Plaintiffs could have sold their
bonds for more or less than the amount they paid for them. Instead
they held onto them claim damages for the bonds' diminished value
as Enron collapsed. Their scenario is analogous to those who held
onto Enron stock. In both cases, the alleged damages are based on

a market exists to determine a price for artificially inflated securities has nothing to do with their bond holder and guaranteed preferred stock claims.

Plaintiffs also challenge JPMorgan's reliance on a statement from *Neal v. Smith Barney & Co.* that "there is general agreement that holder claims cannot be successfully pleaded under common law." *Id.*, 2006 WL 752770, at *2. Plaintiffs counter that each state determines whether to recognize holder claims and that the *Neal* statement rested upon case law that was reversed by *Merrill Lynch v. Dabit*, 126 S. St. 1503, 1511-12 (2006)(holding that the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), 15 U.S.C. § 77p, operates to preempt state-law class action claims brought not only by purchasers and sellers of securities alleging fraudulent manipulation of stock prices, but also class action claims asserted by holders of securities).[25]

_____

speculation and conjecture about what Plaintiffs did not do but assert they would have done had the circumstances been different.

[25] Plaintiffs argue that *Merrill Lynch v. Dabit* recognized that state courts are a proper forum for asserting certain securities fraud or holding claims, and opined that the difference between a plaintiff injured by holding securities rather than selling or purchasing securities is irrelevant because

> the identity of the plaintiffs does not determine whether the complaint alleges fraud "in connection with the purchase or sale" of securities.  The misconduct of which respondent complains here--fraudulent manipulation of stock prices--unquestionably qualifies as fraud "in connection with the purchase or sale" of securities as the phrase is defined in [*SEC v. Zandford*, 535 U.S. 813, 820, 822 (2002), and *United States v. O'Hagan*, 521 U.S. 642, 651 (1997)].

Moreover, contrary to Defendant's representation that the few courts allowing holder claims impose heightened pleading standards, Plaintiffs note that in a case cited by Defendant, *Small v. Fritz Cos.*, the California state court allowed to go forward under fraud or negligent misrepresentation causes of action the plaintiff's claims based on misrepresentations that induced a stockholder to hold on to his stock. *Small v. Fritz Cos., Inc.*, 65 P.3d at 1257. Plaintiffs, relying on the withdrawn opinion in *Shirvanian I*, 2004 Tex. App. LEXIS 182, contend that Texas does recognize holder clams under common law.

Plaintiffs agree with JPMorgan Chase that a cause of action is derivative if it belongs to the bankruptcy estate and that the bankruptcy trustee, as the estate representative, has exclusive standing to assert such claims. *In re Educators Group Health Trust*, 25 F.3d at 1283; *Antonov v. Walters*, 168 S.W.3d 901, 904-05 (Tex. App.–Fort Worth 2005, pet. denied). Claims that arise from a direct injury to the debtor (and thus where the plaintiff's injury derives from that of the debtor) belong to the debtor, and thus to the debtor's estate. *Douglas v. Delp*, 987 S.W.2d 879, 882 (Tex. 1999). To determine whether the claim belongs to the bankruptcy estate, the court must examine whether, under state law, the debtor could have asserted the cause of action at the commencement of the bankruptcy proceedings; in the process the court must also consider the nature of the injury

126 S. Ct. at 1515. Plaintiffs further assert that the Supreme Court stated that state law determines whether holder claims are cognizable.

alleged, i.e., whether the claim is direct or derivative to the
plaintiff. *In re Educators Group Health Trust*, 25 F.3d at 1284.
If Enron could not have asserted Plaintiff's claims at the
commencement of its bankruptcy proceedings, the claims are direct.
*Id.*

Plaintiffs then argue that Plaintiffs do not seek to
recover Enron's property because bonds and debt-like stock were
owned by Plaintiffs with money owed to Plaintiffs. Citing
*Highland Capital Mgmt., L.P. v. Ryder Scott Co.*, No. 01-05-00665-
CV, 2006 WL 2076194 at *8 (Tex. App.--Houston [1st Dist.] 2006, no
pet.)(finding that appellants' misrepresentation and fraud claims
against Ryder Scott are based on their reliance on Ryder Scott's
representations and on appellants's damages, their loss of their
investments in the subordinated notes in reliance; these claims
were based on direct harm to appellants, not a derivative harm to
Seven Seas).[26] They do not assert a "generalized" (derivative)
grievance and therefore have standing to bring their own claims.
They maintain that holder claims are not necessarily derivative.[27]

_____

[26] The Court notes that this opinion states that it "HAS NOT
BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL." 2006 WL
2076194, at *1.

[27] JPMorgan Chase responds that Plaintiffs' claimed injury is
indirect because it derives from the collapse of Enron, which
resulted in Enron's inability to satisfy its debt obligations and
to the diminished value of all of its bonds. It is a generalized
grievance, suffered by all similarly situated creditors. JPMorgan
points out that Ernon raised and settled these same claims in the
Megaclaim litigation in the bankruptcy court. Last, in *In re
Kevco*, 309 B.R. 458 (Bankr. N.D. Tex. 2004), *aff'd*, 113 Fed. Appx.
29, 30-31 (5th Cir. 2004)(fraud claims brought by bondholders of
debtor corporation were derivative because "the debtor could have

Plaintiffs emphasize the legal differences between claims involving the holding of equities (obligations of the corporation), to which the law of the state of incorporation applies (in Enron's case, Oregon),[28] and of debt, to which Texas law applies.  They argue that because the shareholders in essence are the corporation, its equitable owners, claims based on the holding of common stock have the following traits:  the stock represents an ownership in the company, so injury to the owner is not distinguishable from injury to the company; all stockholder-owners share a common claim when a corporation's share prices drop; and shareholders are not entitled to any payment until they sell their ownership interest.  In contrast the bond holders, as creditors of the corporation, have no ownership interest, but instead have purchased a fixed obligation upon the company to pay the debt instrument *before* any claim from the stockholders. Plaintiffs further argue that a drop in the stock prices affects shareholders equally, but has no effect upon a bondholder's individual, fixed claim.  Thus the injury to equity holders as opposed to debt holders is different, contend Plaintiffs.

_____

brought the same claims as of the commencement of the bankruptcy proceeding and because the plaintiffs-appellants complain about an injury that is derivative of the debtors direct injury."), *cert. denied*, 544 U.S. 948 (2005), the only case addressing fraud claims brought by holders of bonds, both the bankruptcy court and the Fifth Circuit concluded that the claims were the property of the bankruptcy estate and could not be brought directly by plaintiffs. Thus contrary to Plaintiffs' arguments, *Kevco* supports finding their holder claims to be derivative.

[28] Tex. Bus. Corp. Act Ann. Art. 8.02.

The bankruptcy trustee may only assert claims on behalf of the debtor corporation and generally cannot sue third parties on behalf of the estate's creditors.   *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991), *citing Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416, 434 (1972)(holding that a trustee in bankruptcy may not pursue an action against a third party that could not have been brought by the debtor); *Educators Group Health Trust*, 25 F.3d at 1284.

Moreover, if the debtor has joined a third party in defrauding creditors, the trustee does not have standing to sue the third party for damages to creditors.   *Wagoner*, 944 F.2d at 113.   "A claim against a third party for defrauding a corporation with the cooperation of management accrues to the creditors, not to the guilty corporation."   *Id.* at 120.   The trustee can only sue if the corporation has suffered damage distinct from the damage to the creditor.   *Id.* at 118-19.   Plaintiffs allege that Enron conspired with JPMorgan Chase and therefore could not assert Plaintiffs' claims against JPMorgan Chase; if Plaintiffs cannot sue JPMorgan, they are left without a remedy.   A co-conspirator in fraud "'cannot also be a victim entitled to recover damages, for he cannot have relied on the truth of the fraudulent representations, and such reliance is an essential element in a case of fraud.'"   *In re Hunt*, 149 B.R. 96, 101 (Bankr. N.D. Tex. 1992)(*quoting Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 454

(7th Cir. 1982), *cert. denied*, 459 U.S. 880 (1982)).[29]  Plaintiffs
maintain that Enron's alleged unclean hands prevent it from suing
JPMorgan Chase.   *See In re Canion*, 196 F.3d 579, 585-86 (5th Cir.
1999)(plaintiffs seeking equitable remedies must come with clean
hands).   They point out that JPMorgan Chase made this same
argument to the bankruptcy court in the Enron "Megaclaim"
litigation, that it asserted the *Wagoner* Rule as its 35th defense
to Enron's claims that it had aided and abetted fraud and
committed civil conspiracy, as well as other affirmative defenses
that are variants of the rule.   Ex 3 to #38.   Plaintiffs contend
that these arguments constitute a judicial admission and that
JPMorgan Chase should be judicially estopped from making the
opposite argument now.[30]

---

[29]  In the Second Circuit, this exception to a bankruptcy
trustee's standing is known as the "Wagoner Rule."   *Wagoner*, 944
F.2d at 118-20.

[30]  JPMorgan argues that the Fifth Circuit has rejected
Plaintiffs' argument that Enron's bankruptcy estate could not have
sued JPMorgan Chase because the two were "*in pari delicto*."
*Educators Group Health Trust*, 25 F.3d at 1286("It is well
established that the bankruptcy estate succeeds to the cause of
action which the debtor could have brought as of the commencement
of the case, subject to any defenses the debtor may have faced. .
. . [Whether] a "defendant may have a valid defense on the merits
of a claim brought by the debtor goes to the resolution of the
claim, and not to the ability of the debtor to assert the claim.").
Thus "[t]hat the defendant may have a valid defense on the merits
of a claim brought by the debtor goes to the resolution of the
claim and not to the ability of the debtor to assert the claim."
*Id.*   JPMorgan also cites *Official Committee of the Unsecured
Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d
147, 156-57 (2d Cir. 2003), the Second Circuit applied Texas law
and *Educators Group Health* "to determine whether Color Tile
Committee's claims against Coopers for breach of fiduciary duty and
breach of contract belong to Color Tile or its creditors," and
concluded that the unsecured creditors' committee, as assignee of
the debtor's estate, had standing to sue the third-party defendant

Furthermore, insist Plaintiffs, as an issue distinct from whether a viable claim belongs to the bankruptcy estate, Texas permits direct actions for fraud against firms that distribute false information to investors. *Highland Capital Management*, 2006 WL 2076194. They argue that Enron's bankruptcy estate could not have asserted Plaintiffs' claims against JPMorgan Chase because the claims belonged solely to Plaintiffs and were based on their lost investments and on their actual reliance on JPMorgan Chase's allegedly fraudulent statements. Under Texas law, therefore, Plaintiffs' conspiracy and fraud causes of action are not derivative, but individual, direct claims abased on their lost investments and their reliance on JPMorgan Chase's purported fraudulent statements, and are properly before this Court. *See also Cotten v. Republic Nat'l Bank of Dallas*, 395 S.W.2d 930, 941 (Tex. Civ. App.–Dallas 1965, writ ref'd n.r.e.)("[O]ne who proves that he relied on false representations to the corporation's financial condition and was thereby induced to extend credit to the corporation, or to purchase stock in it . . . must in his own name maintain a separate suit for his damages against the person who uttered the fraudulent representations. The aggrieved party and he alone may maintain the suit. Even then a creditor . . .

---

regardless of the third-party defendant's complicity and its *in pari delicto* defense. JPMorgan Chase points out that it asserted affirmative defenses, including, *in pari delicto*, in the Megaclaim litigation; the assertion of those defenses did not bar Enron from asserting its claims. It settled with Enron before the validity of the defenses was resolved. This Court agrees with JPMorgan Chase's interpretation of the Fifth Circuit law regarding *in pari delicto* as an affirmative defense.

who did not know or rely on such false representation, or was not
induced by it to extend credit or invest his money cannot recover
for the alleged fraud.[31]   The receiver has no right to bring or
maintain such a suit.").

          Finally Plaintiffs claim that holder claims are
cognizable under Texas law in cases involving debt.   Cases have
long recognized that an injury may be sustained from a failure to
act when the inaction is induced by a misrepresentation and may
support a suit for common law fraud.   *See, e.g., Burroughs v. APS
Int'l, Ltd.*, 93 S.W.3d 155, 162 (Tex. App.–Houston [14th Dist.]
2002, pet. denied); *Haddaway v. Smith*, 256 S.W. 965, 966 (Tex.
Civ. App.–Amarillo 1923, no writ); Restatement (Second) of Torts
§§ 531 and 537 (1976).[32]   The Texas Supreme Court has not yet ruled
on whether claims based on the holding of stock may be brought
under Texas common law, *Neal*, 2006 WL 752770 at *7-8, nor has it
indicated that it would treat such claims differently than claims
involving the holding of debt.   Plaintiffs therefore turn to and

---

[31] This Court observes that Plaintiffs have not shown, and
cannot show, that other Enron securities owners did not rely on all
of the very public sources of information that they did to
demonstrate that their claims are personal and individual to them.

[32] JPMorgan Chase points out that neither *Burroughs* (affirming
dismissal of fraud claim against process server that alleged that
the process server made false statements regarding the time to
answer a complaint in a prior law suit) nor *Haddaway* (upholding
fraud claim against seller of real estate where seller deceived
buyer into a breach of the real estate contract by representing to
the buyer that the buyer did not need to make any payments under
the contract at the designated time and location) dealt with claims
brought by holders of debt securities or even of equity, but only
general claims of fraudulent inducement.

rely on the withdrawn *Shirvanian I,* 2004 Tex. App. LEXIS 182, to argue that they have a viable fraud claim.

In sum, Plaintiffs insist that JPMorgan Chase has not met its burden of proof under Rule 12(b)(6) because it did not argue the complete derivative/direct test,[33] did not explain how the Enron bankruptcy trustee could assert Plaintiffs' claims against a co-conspirator, did not cite any case law to establish the validity of its argument against Texas holder claims, did not cite any authority to suggest its argument would be adopted by the Texas Supreme Court, and failed to establish which law applies to Plaintiffs' claims.

### JPMorgan Chase's Reply (#39)

JPMorgan Chase insists that the holder claims should be dismissed because (1) they are not cognizable under Texas law and (2) because regardless of whether the holdings are in debt or in equity, by their very nature they are derivative of injury to the debtor and therefore can only be pursued by the bankruptcy trustee. *Educators Group Health*, 25 F.3d at 1284, 1285 ("If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate";

---

[33] Plaintiffs insist that JPMorgan Chases's derivative claim argument fails to distinguish between holders of debt and holders of equity and erroneously argues that a bankruptcy trustee, by stepping into the shoes of the debtor corporation, may assert a creditor's individual claims against a third party even if the debtor corporation was a co-conspirator in the very wrongful acts charged by Plaintiffs.

"general harm to creditors *necessarily follow* from the fact that the debtor has been injured").

JPMorgan observes that in *Crocker*, to get around established Mississippi law that "a shareholder does not have standing to bring a direct cause of action when the only damage alleged is based on a diminution in the value of their stock," the plaintiff shareholders alleged that the controlling shareholders misrepresented the financial condition of the bank, which inflated the price of the Bank's stock, while inducing the minority shareholders to refrain from selling their stock, an injury they dubbed "lost profit opportunity."  826 F.2d at 350.  The Fifth Circuit concluded that their claims were not different from a diminution-in-value injury because "the end result was that all the shareholders . . . lost the entire value of the stock."  Not only was it a general, derivative claim, but the *Crocker* court further opined that the claim was too speculative because there was no allegation that any shareholders "desired specifically to sell their stock at a given point, but were deterred from effectuating a sale because of the misrepresentations."  *Id.* at 352.  The court characterized their theory of a "lost profit opportunity" as an "illusion":

> Had this [concealed, material information about the failing condition of the Bank] been released, the stock price would have immediately and precipitously fallen, especially if, as is implicit in the Crockers' theory, an entire class of shareholders had simultaneously dumped their stock on the market.  Thus there would have been no market for the stock at the artificially high price.

*Id.* at 351.  The court noted the paradox in the Crockers' theory, i.e., "on the one hand, they claim the defendants' scheme caused their injury; yet on the other had, without the scheme, the minority shareholders could never have realized the artificially high profit that they claim to have unjustly lost.  JPMorgan Chase maintains that here, although bonds and not stock are at issue, the claims are just as speculative.

Moreover, Defendant points out that not only could Enron have raised a claim for direct injury at the commencement of the bankruptcy proceeding, it did so in the "Megaclaim" adversary proceeding, in which Enron, as "Reorganized Debtor," sued JPMorgan Chase and other banks for aiding and abetting Enron's fraud and for civil conspiracy, arising out of their participation with Enron in certain prepay transactions, and sought damages for injuries including dissipation of Enron's assets and wrongful expansion of its debt "out of all proportion to its ability to repay" and which thus caused Enron to become insolvent.  All moneys recouped from the Megaclaim litigation, including JPMorgan Chase's settlement, went to the debtor's estate to be distributed among creditors, not just to Plaintiffs, who concede they have already received partial distribution on one of the bonds they hold from the Enron estate.  These facts undermine Plaintiffs' insistence that the injury they suffered is distinct from that suffered by Enron and other creditors and their argument that the estate had no standing to bring such a claim.

In sum, urges JPMorgan Chase, the Court should dismiss the holder claims against it with prejudice.

### Plaintiffs' Sur-Reply (#40)

Reiterating earlier arguments, Plaintiffs charge that JPMorgan Chase fails to cite any authority for its contention that holder claims are not cognizable under Texas law under common law fraud.  If the Court does not deny JPMorgan Chase's partial motion for dismissal, they request leave to replead to add factual specificity that would meet the heightened pleading-with-particularity requirements of courts that have recognized holder claims.  *See, e.g., Small v. Fritz Cos., Inc.*, 65 P.3d at 1256-57; *Rogers*, 268 F. Supp. 2d at 1311-12 & n.13.

### Court's Decision

JPMorgan Chase has argued that holder claims have not been allowed by numerous courts, including the United States Supreme Court in *Stamps v. Manor Drug Stores*, 421 U.S. 723, 740-46 (1975)(recognizing the risk of meritless and "vexatious litigation" filed to extort a settlement, posed by holding claims).  JPMorgan Chase selects this statement out of context and ignores *Blue Chip Stamps*' comments relating to the issue here, holder claims under state common law.

While the Supreme Court in *Blue Chip Stamps* concluded that a sale or purchase was necessary for a private action for damages under § 10(b) and Rule 10b-5 of the 1934 Act, embodied in the long-established rule of *Birnbaum v. Newport Steel Corp.*, 193 F.3d 461 (2d Cir. 1952), it further noted, "[I]t has long been

established in the ordinary case of deceit that a misrepresentation which leads to a refusal to purchase or to sell is actionable in just the same way as a misrepresentation which leads to the consummation of a purchase or sale" and that this trend "suggest[s] a direction away from rules such as Birnbaum." *Blue Chip Stamps,* 421 U.S. at 744, *citing Butler v. Watkins*, 13 Wall. 456 (1872).  The high court further pointed out that in *Butler*, "the plaintiff and the defendant met with one another in New Orleans, that one presented a draft agreement to the other, and that letters were exchanged relating to that agreement." *Id.* at 745.  In contrast, it observed that "[i]n today's universe of transactions governed by the 1934 Act, privity of dealing or even personal contact between potential defendant and potential plaintiff is the exception and not the rule"; instead  millions of investors use giant financial exchanges and get their information for corporate reports or financial journals or daily newspapers without any direct contact with each other. *Id.*  The high court recognized that  the Birnbaum rule serves a practical value to "limit[] the class of plaintiffs to those who have at least dealt in a security to which the prospectus, representation or omission relates" and to bar suits by bystanders who "could await developments on the sidelines without risk, claiming that inaccuracies in disclosure caused nonselling in a falling market and that unduly pessimistic predictions by the issuer followed by a rising market caused them to allow retrospectively golden opportunities to pass." *Id*. at 747.

Nevertheless, significantly for Plaintiffs's claims here, the Supreme Court observed that the "arbitrary restriction" of private § 10(b) actions to purchasers and sellers "unreasonably prevents some deserving plaintiffs from recovering damages," although it found countervailing advantages to the Birnbaum rule that caused it to sustain the rule in federal securities class action litigation. *Id.* at 738. The Supreme Court stated, "Obviously this disadvantage is attenuated to the extent that remedies are available to nonpurchasers and nonsellers under state law." *Id.* at 738 & n.9 ("Obviously this disadvantage [of the Birnbaum rule] is attenuated to the extent that remedies are available to nonpurchasers and nonsellers under state law. . . . Thus, for example, in Birnbaum itself, while the plaintiffs found themselves without federal remedies, the conduct alleged as the gravamen of the federal complaint later provided the basis for recovery in a cause of action based on state law."). Therefore *Blue Chip Stamps* left open a door for states to recognize holder claims under common law fraud and misrepresentation, in particular where there were privity and/or direct communication evidencing actual reliance between the plaintiff and the defendant.

Plaintiffs argue that Defendant has failed to meet its burden under Rule 12(b)(6), and attempts to shift the burden to JPMorgan Chase. The Court finds Plaintiffs' contention that JPMorgan must cite Texas authority expressly stating that Texas does not recognize holder claims both illogical and unpersuasive; what is required is a Texas Supreme Court case, or at least a

lower court case, that affirmatively recognized such claims under Texas common law.  Moreover, the question of whether and under what circumstances the Texas Supreme Court would recognize a holder claim under common law fraud is one of law, not fact.

Neither side has cited any Texas court addressing the issue of whether Texas would recognize holder claims.  As a result, like the *Neal* court in the Southern District of New York, this Court must predict whether the Texas Supreme Court would allow such claims under Texas common law fraud.

As a general rule, the majority of states have not recognized a cause of action for holder claims, usually because of their speculative nature, and those that do, have imposed heightened pleading standards.  *See, e.g., Small v. Fritz*, 65 P. 3d 1255; *Rogers*, 268 F. Supp. 2d at 1305.  Others, even more specific, require a showing of actual reliance by pleading face-to-face, direct communication[34] with the defendant when the defendant made the alleged misrepresentation.  *In re WorldCom,*

---

[34] This Court notes that in *Blue Chip Stamps (*holding that only purchasers and sellers may bring a claim under § 10(b) and Rule 10b-5, the Supreme Court gave strong policy reasons for affirming the Birnbaum rule: a holder claim is not "verifiable by documentation," depends on oral recollection," will probably encourage frivolous and "vexatious litigation" that is difficult to dismiss without a trial.  421 U.S. at 740-43.  In looking to a possible remedy for holders under state law, the Supreme Court observed that before the development of enormous and impersonal securities markets and exchanges, in an "ordinary case of deceit," "to which a claim under Rule 10b-5 certainly has some relationship," the plaintiff shareholder and the alleged defendant/misrepresenter were in direct communication and "presumably would have recognized one another on the street had they met."  421 U.S. at 744.  These state court cases requiring pleading and proving actual reliance by direct communication appear to be drawing on such concepts.

*Inc. Sec. Litig.*, 382 F. Supp. 2d 549, 559-560 (S.D.N.Y. 2005)(predicting that New York would recognize a common-law-fraud claim where plaintiff pleads specific direct communication with defendant to satisfy actual reliance element); *Gutman v. Howard Saving Bank*, 748 F. Supp. 254 (D.N.J. 1990); *Neal,* 2006 WL 752770*,* at *3 (predicting Texas Supreme Court would recognize holder claims under common law only where the "narrowly crafted circumstances of *Shirvanian I* were paralleled). The vacated, and thus void, *Shirvanian I* opinion would fall into the latter category.

While not directly on point, there are sufficient parallels in *Texas Capital Securities, Inc. v. Sandefer*, 58 S.W. 3d 760 (Tex. App.--Houston [1st Dist.] 2001), that lead this Court to find that the Texas Supreme Court would require some kind of direct communication or privity and actual reliance for any holder claims. In *Texas Capital*, the appellate court *inter alia* affirmed a jury finding that a stock promoter and an employee, agent and Officer of Titan Resources, Inc. in 1996 and 1997, Butch Ballow, committed fraud under Texas law when he made material misrepresentations and arranged for a stock broker with Texas Capital Securities, to communicate information about Titan Resources, Inc.'s business plans to appellees/plaintiffs J.D. Sandefer, III and Stephen F. Smith, who had previously purchased stock in Titan Resources, Inc. and who relied on the information in delaying selling that stock. The price of Titan's stock

subsequently plummeted and appellees/plaintiffs sued under common law fraud and the Texas Securities Act.

In reviewing the evidence, the appellate court observed that even though the plaintiffs never met Ballow before purchasing the stock he recommended, the stock broker "prefaced much of his information relayed to appellees with references to information he received from Ballow.  Sandefer's and Smith's actions were predicated on the information Johnson gave them which he conveyed from Ballow."  *Id.* 58 S.W. 3d at 772.

Ballow argued that there could be "no fraud if Sandefer and Smith did not rely on misrepresentations he made directly to them . . . [and] that, absent privity, there can be no fraudulent misrepresentation . . . ."  Id.  Ballow relied on *Kanon v. Methodist Hospital,* 9 S.W.3d 365 (Tex. App.–Houston[14th Dist.] 1999, no pet.), in which the plaintiff sued Methodist Hospital for fraud alleging that Methodist made affirmative misrepresentations to the medical community, including to plaintiff's oral surgeon, about the adequacy of testing performed on the TJM device implanted in Kanon that purportedly injured him.  58 S.W. 3d at 772.  The Fourteenth Court of Appeals held that Methodist could not be liable for fraud because it was not in privity with Kanon and further opined that "[f]or the misrepresentation to be actionable, the maker must intend to influence the very person to whom he makes the representation." *Id.* at 772.

In affirming the verdict that Ballow committed fraud, the First Court of Appeals stated regarding fraudulent misrepresentations,

The Texas Supreme Court held in 1890 that "it is sound doctrine that a third person, to whom they were not directly made, can maintain an action of deceit . . . if it appear[s] that the defendant's false representations were made with a direct intent that he should act upon them in the manner which occasioned the injury." *Gainesville Nat'l Bank v. Bamberer*, 77 Tex. 48, 13 S.W. 959, 960-61 (1890). Furthermore, the Restatement (Second) of Torts addresses the issue of misrepresentations to third parties. The general rule in section 531 states:

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

58 S.W. 3d at 772. Although there was no privity between plaintiffs and Ballow, the First Court of Appeals pointed out that "Ballow's actions were intended to influence" Sandefer and Smith and that Ballow admitted that he asked stockbroker Johnson to communicate to appellees/plaintiffs information about Titan's business plans. *Id.* at 772. Moreover, Johnson quoted Ballow in response to questions from Sandefer and Smith. *Id.* at 772, 773. Thus there was far more direct communication, though slightly attenuated, than was the case where plaintiffs relied on public sources of information directed toward anyone or everyone. Moreover, when Ballow was asked if he made the misrepresentations to Johnson with the intent that Johnson relay them to Sandefer and Smith, he asserted his Fifth Amendment privilege against self-

incrimination and thus the jury was entitled to draw a negative inference. *Id.* at 773.   In essence, the First Court of Appeals apparently viewed the stockbroker as a mere conduit through which Ballow communicated direct, personal information specifically to intended recipients Sandefer and Smith, and "the information seemed more credible and reliable because it was communicated by one of Titan's officers." *Id.* at 772.

Given the stream of cases evolving from *Blue Chip Stamps* that have examined and permitted restricted common law fraud claims for holders of securities and *Texas Capital Securities*, the Court is persuaded, with the practical policy concerns that lead to these restrictions, that the Texas Supreme Court would limit, if not totally exclude, holder claims under Texas common law fraud.

If the Texas Supreme Court would allow holder claims under common law fraud provided they were pleaded with specificity and actual reliance based on direct communication, this Court finds that Plaintiffs' Second Amended Complaint clearly indicates that the sources of information on which Plaintiffs relied were Enron's SEC financial statements, which JPMorgan's transactions allegedly "helped make false," and which were issued to the public at large, as well as on analyst reports, financial information services and news, all disseminated to the public at large, but not on any direct or specifically targeted contact between Plaintiffs and JPMorgan.  #25 at 5, ¶ 20.  Plaintiffs also claim they relied on "information created by Defendant and disseminated through various media outlets to Plaintiffs and other investors,"

again a public misrepresentation, not a direct communication.
Furthermore none of these sources of information has been pleaded
with specificity.  Without particularity in the pleading of the
misrepresentations or of actual and justifiable reliance based on
direct communication, the Pandora's box of vexatious and meritless
suits feared by the *Blue Chip Stamps* Court in affirming the
Birnbaum rule would be realized in Texas state courts under common
law fraud.

        Finally, assuming that the Texas Supreme Court would
allow these holder claims to go forward under Texas common law
fraud if adequately pleaded, the Court would find that the
essential nature of the holder claims pleaded by Plaintiffs here,
no matter how they are characterized by Plaintiffs, are derivative
claims that belong to the debtor's estate.  Texas frequently turns
to Delaware law when dealing with corporate issues.  If this Court
applied the *Tooley* test, it would find that Plaintiffs have failed
to allege an injury independent of any alleged injury to the
corporation.  845 A.2d at 1039.  The alleged wrongful conduct by
JPMorgan Chase caused injury to the corporation as a whole and was
indirectly experienced by all Enron securities owners.  Diminution
in value of their particular bonds is no different from the
diminution in value of all Enron securities allegedly caused by
misrepresentations of Enron's financial condition.  *See also
Crocker,* 826 F.2d at 351 (characterizing plaintiffs' theory of a
"lost profit opportunity" as an "illusion": if accurate material
information had been disseminated, and "as is implicit in the
Crockers' theory, an entire class of shareholders had

- 38 -

simultaneously dumped their stock on the market. Thus there would have been no market for the stock at the artificially high price.").

Plaintiffs have already filed two amended complaints. They have had more than a bite of the apple. The relevant case law to the issue *sub judice* is not new. The Court finds that allowing another amendment is not appropriate, especially when leave to do so is so conclusorily requested despite the clear statements in the complaint that Plaintiffs relied on the most public of sources and that there were no allegations of any direct or personal communication between Plaintiffs and JPMorgan Chase that induced them to hold their Enron debt securities.

Accordingly, the Court

ORDERS that JPMorgan Chase's partial motion for dismissal (#29) is GRANTED.

SIGNED at Houston, Texas, this 12th day of March, 2007.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE