IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § § | MDL-1446 |
| MARK NEWBY, ET AL., | § § | |
| Plaintiffs | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-3624 CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § § | |
| Defendants | § | |
| AMERICAN NATIONAL INSURANCE COMPANY, et al., | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. G-02-0299 |
| J.P. MORGAN CHASE & COMPANY, | § § § | |
| Defendant. | § | |

## OPINION AND ORDER

Pending before the Court in G-02-0299 are the following motions:  (1) Defendant JPMorgan Chase & Co.'s[1] motion for a summary judgment (#99) dismissing with prejudice Plaintiffs American National Insurance Company, American National Investment Accounts, Inc., SM&R Investments, Inc., American National Property and Casualty Company, Standard Life and Accident Insurance Company, Farm Family Life Insurance Company, and Farm Family Casualty Insurance Company's[2] claims for aiding and abetting a

---

[1] The Court uses Defendant's spelling of its name.  Plaintiffs refer to Defendant as "JPMC."

[2] Plaintiff National Western Life Insurance Company was previously dismissed from this action.

primary violation of the Texas Securities Act ("TSA," Tex. Stat. Rev. art. 531-33), statutory fraud (Texas Business & Commerce Code § 27.01), common law fraud, and civil conspiracy to commit fraud, in connection with Plaintiffs' purchases of certain Enron-related securities; (2) Plaintiffs' motion for trial setting (#72); (3) Defendant's motion to compel production of settlement agreements and related documents pursuant to Fed. R. Civ. P. 26(e) (#116); and (4) Plaintiffs' motion for status conference (#133).

Because the Court's resolution of Defendant's motion for summary judgment could moot the other motions, the Court addresses it first.

## I.  Defendant's Motion for Summary Judgment

Two threshold matters limit the scope of review of Defendant's summary judgment motion.

First, Plaintiffs and Defendant agree that the Court has previously made determinations that invalidate Plaintiffs' TSA claims; therefore Plaintiffs state they do not urge them again here (#105 at 2; #109 at 1).[3]  *In re Enron Corp. Sec., Derivative*

---

[3]    For the same reasons applicable here, this Court decided that Plaintiffs' allegations under the TSA against other financial institutions are deficient.  Opinion and Order of Partial Summary Judgment (instrument #76 at 34) of June 12, 2007, in *American National Ins. Co. v. Citigroup, et al.*, No. G-02-723 (S.D. Tex.); Opinion and Order (instrument #39 at 12 n.7) of August 24, 2007, in *American National Ins., et al. v. Royal Bank of Canada, et al.*, G-03-0481 (S.D. Tex.)*, also available at *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 759 (S.D. Tex. 2007).
        In these opinions, this Court concluded that Section 33A(2) of the TSA limits liability to the immediate seller or the person who successfully solicits the purchase on behalf of the owner of the securities.  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 601-08 (S.D. Tex. 2003)(a statutory "seller under the TSA is the person who sold a security directly to the purchaser/plaintiff or who acted as the vendor's agent and solicited the sale").  Noting that the record here shows that Plaintiffs purchased their Enron-related securities from

& "*ERISA*" *Litig. (Am. Nat'l Ins. Co. v. Royal Bank of Canada)*, 540
F. Supp. 2d 759, 797-99 (S.D. Tex. 2007) (the "RBC decision").
In addition, Plaintiffs represent, and Defendant accepts, that
they will not prosecute their common-law simple fraud claims
against JPMorgan Chase.  #105 at 2; #109 at 1.  Therefore to
clarify the record in this action against JPMorgan Chase, the
Court grants Defendant's pending motion for summary judgment as
to the TSA and common-law fraud claims.

Second, Defendant has expressly restricted its motion
for summary judgment on the remaining claims to the absence of
competent evidence on the single element of causation (Plaintiffs
must prove their losses were the direct and proximate result of
JPMorgan Chase's actions, and not of the myriad other factors that
caused Enron's collapse) in both their statutory fraud claim and
their civil conspiracy-to-defraud claim.  Therefore the Court does
not address arguments raised in the briefing about any of the
other elements in the remaining statutory fraud and civil
conspiracy-to-commit-fraud claims.

## A.  Remaining Causes of Action

entities other than Enron, Defendant asserts that Plaintiffs have
not and cannot show that Enron was the statutory "seller" of their
securities under the TSA.  Therefore Plaintiffs' derivative aiding
and abetting claim against JPMorgan Chase under the TSA fails.  *See*
*Energytec, Inc. v. Proctor*, 516 F. Supp. 2d 660, 677 (N.D. Tex.
2007)("[T]hough Texas law allows a claim for aiding and abetting
securities fraud, the Texas statute limits the remedy to one in
privity with the sale of a security."); *In re Worldcom, Inc. Sec.*
*Litig.*, No. 03 Civ. 1785, 2006 U.S. Dist. LEXIS 21385 (S.D.N.Y.
Apr. 24, 2006)("For primary liability under [Section 33A of the
TSA] the purchaser/plaintiff may sue only his immediate 'seller'
(i.e., the person and/or his agent who successfully passes title
[or] who actively solicited the purchaser)"(quoting *Newby v. Enron*
*Corp.*, No. H-01-3624, 2004 WL 764664, at *7 (S.D. Tex. Mar. 31,
2004)).

The controlling pleading is the Second Amended Complaint (#25), minus those claims dismissed by the Court in its March 12, 2007 Opinion and Order #61 and now summary judged *supra* here.[4]

## 1.   Statutory Fraud, Section 27.01 of the Texas Business and Commerce Code (Vernon 2008)

Plaintiffs allege that Defendant conspired to violate and aided and/or abetted Enron in Enron's making material false misrepresentations and omissions for the purpose of inducing Plaintiffs to enter into contracts for the purchase of Enron securities, violations of Section 27.01.

They claim that Enron was a primary violator of the statute. The elements of a primary violation of Texas Businessand Commerce Code § 27.01(a) in relevant part are:

> (a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a
> (1) false misrepresentation of a past or existing material fact, when the false representation is
> (A) made to a person for the purpose of inducing that person to enter into a contract; and
> (B) relied on by that person in entering that contract . . . .

Under section 27.01(b), "A person who makes a false representation . . . commits the fraud described in Subsection (a)

_____

[4] In the Second Amended Complaint (#25), Plaintiffs allege that Defendant conspired with Enron to manipulate artificially and falsify Enron's reported financial condition to trick investors and rating agencies into believing that Enron was financially sound and had excellent growth prospects. In particular through the Mahonia Prepay Transactions (*id*. at ¶¶ 16-18, 69-125), Defendant purportedly enabled Enron to borrow over $3.7 billion from Defendant, which Enron did not report as debt on its consolidated statements because Defendant structured the transactions to look like commodity trades rather than loans. Other fraudulent transactions that Defendant participated in with Enron included LJM2, Project Fishtail, and Project Slapshot. *Id.* at ¶¶ 146-185.

of this section and is liable to the person defrauded for actual damages."

Under section 27.01(c), "A person who makes a false representation . . . with actual awareness of the falsity thereof commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages.[5]  Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness."[6]  *See also Larsen v.*

---

[5] For a primary violation, therefore, a plaintiff need not establish that the defendant had actual awareness of the falsity of the representations if he seeks only actual damages and not exemplary damages.  *Rodriguez v. Lusk*, No. 08-03-00385-CV, 2004 WL 2307443 (Tex. App.--El Paso Oct. 14, 2004), *citing Larsen v. Carlene Langford & Associates, Inc.*, 41 S.W. 3d 245, 249 (Tex. App.--Waco 2001), and *Scott v. Sebree*, 986 S.W. 2d 364, 371 (Tex. App.--Austin 1999, pet. denied).

[6] Plaintiffs allege (*id.* at ¶¶ 224-25, 228) that through its transactions with Enron, JPMorgan Chase "had actual awareness of the falsity of Enron's reported accounting in SEC filings and other financial reports" on which Plaintiffs relied (¶¶ 191-204) in making their investment decisions:

> 225.  The JPMorgan Chase Presentation to Enron (May 3, 2001), as well as numerous communications between various JPMC employees, including Stephen Thorington, Don Layton, James Balantine, George Serice, Robert Treband, and others, as cited in paragraphs 50, 110-111, 114-117, 125-128, 130 and 133-134, *supra*, all confirm that Defendant had actual awareness of the accounting gimmickry and fraudulent representations perpetrated by the use of the Mahonia Prepay Transactions. . . .
> 228.  In short, Defendant knew precisely how Enron was accounting for the Mahonia Prepay Transactions on its consolidated balance sheets as a means of misrepresenting its financial condition and perpetrating fraud. Further, because Defendant devised the Mahonia Transactions, and actively aided Enron in providing false information about Mahonia's purported independence from JPMC, Defendant plainly had actual knowledge of the false

*Carlene Langford & Associates, Inc.*, 41 S.W. 3d 245, 249 (Tex. App.--Waco 2001)(plaintiffs "can establish a statutory fraud claim under section 27.01 . . . by showing:  1. a representation of material fact; 2. which is false; 3. made to induce a person to enter a contract; 4. which was relied upon by that person in entering the contract; and 5. which **caused** injury [emphasis added by the Court].") *citing Scott v. Sebree*, 986 S.W. 2d 364, 371 (Tex. App.--Austin 1999, pet. denied); *in accord Robbins v. Capozzi*, 100 S.W. 3d 18, 26 (Tex. App.--Tyler 2002).  "'Statutory fraud differs from common law fraud[7] "only in that it does not require proof of knowledge or recklessness as a prerequisite to the recovery of actual damages.'"  *Id.*  Because the statute is derived from common law fraud, Plaintiffs must show that they actually and justifiably relied upon Enron's allegedly fraudulent misrepresentations.  *Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1025 & n.4 (5th Cir. 1990), *abrogated on other grounds, Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561 (1995).

Plaintiffs allege that Defendant JPMorgan Chase was a secondary violator of the statute.  Section § 27.01(d) in relevant part addresses secondary liability for aiding and abetting a

representations made by Enron.

---

[7] "The elements of common law fraud are that (1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance upon the representation; and (6) the party suffered injury."  *Avery Pharmaceuticals, Inc. v. Haynes and Boone, LLP*, No. 2-07-317-CV, 1009 WL 279334, *10 (Tex. App.--Fort Worth Feb. 5, 2009), *citing Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W. 2d 507, 524 (Tex. 1998).

primary violator:

> A person who (1) has actual awareness of the falsity of a representation . . . made by another person and (2) fails to disclose the falsity of the representation . . . to the person defrauded, and (3) benefits from the false representation . . . commits the fraud described in Subsection (a) of this section and is liable to the person defrauded for exemplary damages. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

In *Glazener v. Jansing,* No. 03-02-00796-CV, 2003 WL 22207226, *5 (Tex. App.--Austin Sept. 25, 2003), appellants argued that they could not be held liable for actual damages under section 27.01(d) because it expressly provided only for exemplary damages against a person who knows of, fails to correct, and benefits from another's misrepresentations. The Austin appellate court rejected that argument, pointing out that section 27.01(d) also expressly states that a person who has actual awareness of the falsity of the other person's misrepresentation, remains silent, and benefits from it, commits the fraud described in section 27.01(a), and that section 27.01(b) states that a person who commits the fraud described in section 27.01(a) is liable for actual damages. Therefore a person who knows of another's misrepresentations, fails to disclose them to the person defrauded, and benefits therefrom can be liable for both actual and exemplary damages under the statute. *Id.*

Two appellate courts have concluded that the Texas Supreme Court's definition of "actual awareness" in a DTPA case[8]

---

[8] *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.,* 973 S.W. 2d 51, 53-54 (Tex. 1998).

"'would be similar, if not identical'" to that for section 27.01 of the Texas Business & Commerce clause:

> actual awareness 'does not mean merely that a person knows what he is doing; rather, it means that a person knows what he is doing is false, deceptive, or unfair. In other words, a person must think to himself at some point, "Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway.'"

*Woodlands Land Development Co. v. Jenkins*, 48 S.W. 3d 415, 426 (Tex. App.--Beaumont 2001), and *Scott v. Sebree*, 986 S.W. 2d 364, 371 (Tex. App.--Austin 1999, pet. denied), *citing  St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W. 2d 51, 53-54 (Tex. 1998).

## 2.  Common-Law Civil Conspiracy to Defraud

Plaintiffs allege that Defendant conspired with Enron to participate in deceptive transactions, including twelve Mahonia transactions, that would allow Enron to disseminate false financial information in filings with the SEC (overt acts) and promulgate information that would mislead credit rating agencies and the investing publicly generally.

A civil conspiracy is composed of two or more persons combining to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Massey v. Armco Steel Co.*, 652 S.W. 2d 932, 934 (Tex. 1983).  The elements of a cause of action for civil conspiracy in Texas are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result. *Juhl v. Airington*, 936 W.W.2d 640, 644 (Tex. 1990); *Tri v. J.T.T.*, 162 S. W. 3d 552, 556

(Tex. 2005).   To impose liability on a defendant for civil conspiracy to defraud, plaintiff must establish (1) that there was such a conspiracy and (2) that the particular defendant, here JPMorgan Chase, agreed with one or more of the conspirators about the claimed illegal object of the conspiracy and intended to have it brought about. *Ward v. Sinclair*, 804 S.W. 2d 929, 931 (Tex. App.--Dallas 1990), *citing Zervas v. Faulkner*, 861 F.2d 823, 836 (5th Cir. 1988).

The "meeting of the minds" element is "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Transport Insurance Co. v. Faircloth*, 898 S.W. 2d 269, 278 (Tex. 1995).   "[T]here must be a preconceived plan and unity of design and purpose." *Goldstein v. Mortenson*, 113 S.W. 3d 769, 779 (Tex. App.--Austin 2003)(A conspiracy to defraud on the part of two or more persons means a common purpose, supported by a concerted action to defraud, that each has the understanding that the other has that purpose.").   "'There must be an agreement or understanding between the conspirators to inflict a wrong against, or injury on, another, a meeting of the minds on the object or course of action, and some mutual mental action coupled with an intent to commit the act which results in injury; in short, there must be a preconceived plan and unity of design and purpose, for the common design is of the essence of the conspiracy.'"   *Id.*[9]

_____

[9] That knowledge must be specific and actual.  In *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W. 2d 854 (Tex. 1968), the Texas Supreme Court opined,

> For purposes of this opinion, we may assume
> that Schlumberger had good reason to believe
> that the conspiracy existed as alleged by
> Nortex, and that the existence and object of

*See also Laxson v. Giddens,* 48 S.W. 3d 408, 410 (Tex. App.--Waco 2001)("*One without knowledge of a conspiratorial plan or scheme to injure another by the commission of a particular wrong cannot share the intent to injure such other.* [emphasis in original]").

"For a civil conspiracy to arise, the parties must be aware of the harm or the wrongful conduct at the beginning of the combination or agreement [or when the party joins the conspiracy]. . . . One cannot agree, expressly or tacitly, to commit a wrong about which he has no knowledge." *Firestone Steel Products Co.*

> the conspiracy could have been discovered by Schlumberger by the exercise of the slightest degree of diligence. We are unwilling to say, however, that the evidence will support a reasonable inference that Schlumberger had actual knowledge that the four particular wells had been or were to be bottomed under adjoining or adjacent leases for the purpose of producing oil owned by others, or that Schlumberger intended to participate in any such wrong. In the absence of such knowledge and intent, a finding that Schlumberger was a conspirator with the lease owners, drillers and others to bottom the wells beyond lease lines and wrongfully take the oil of others is insupportable   There is no evidence that Schlumberger knew the location of the boundary lines of the leases on which the four wells had their surface locations. There is no evidence that Schlumberger knew or was advised that the wells had to be bottomed beyond lease lines in order to produce. . . . There is no evidence that Schlumberger knew who owned the adjoining leases and mineral rights, had any reason to agree to a plan or scheme of its customers wrongfully to produce and convert the oil of such owners, or had any reason to, or did, share an intent to injure them. . . . There is no evidence that Schlumberger shared in any of its customer's [*sic*] ill-gotten gains. The uncontradicted evidence is that Schlumberger was performing a service for which it was paid on a professional basis at its regular and customary rate.

*Id.* at 857-58.

*v. Barajas*, 927 S.W. 2d 608, 614 (Tex. 1996), *citing Triplex Communications, Inc. v. Riley*, 900 S.W. 2d 716, 719 (Tex. 1995)("[C]ivil conspiracy requires specific intent.  For a civil conspiracy to arise, the parties must be aware of the harmful or wrongful conduct at the inception of the combination or agreement."); *Schlumberger*, 435 S.W. 2d at 857 ("[O]ne without knowledge of a conspiratorial plan or scheme to injure another by commission of a particular wrong cannot share the intent to injure the other.").

Nevertheless, "[t]he agreement need not be formal; rather, the understanding may be tacit; and it is not essential that each conspirator have knowledge of the details [of the conspiracy]; inferences of concerted action may be drawn from participation in the transactions." *J.T.T. v. Chon Tri*, 111 S.W. 3d 680, 684 (Tex. App.–Houston [1st Dist.] 2003)(*citing Bourland v. State*, 528 S.W. 2d 350, 354 (Tex. Civ. App.--Austin 1975, writ ref'd n.r.e.)), *reversed on other grounds*, 162 S.W. 3d 552 (Tex. 2005).

On the other hand, "[t]he fact that a conspirator is not present at, or does not participate in, all of the conspiratorial activities does not, by itself, exonerate him." *United States v. Ashley*, 555 F.2d 462, 467 (5th Cir. 1977), *cert. denied sub nom Leveriette v. United States*, 434 U.S. 869 (1977); *see also United States v. Thomas*, 686 F. Supp. 1078, 1087-88 (M.D. Pa. 1988)(quoting *Ashley*).  "[I]t is axiomatic that it is not necessary for each conspirator to have entered into the unlawful agreement at its inception." *Id.* at 468.  A person may participate in a conspiracy without knowing the identities of all

the other co-conspirators." *Id., citing United Stats v. Capo*, 791 F.2d 1054, 1066 (2d Cir. 1986).  "[A] changing cast of characters does nothing to lessen the fact of one conspiracy.  Once the existence of a common scheme of conspiracy is shown, 'slight evidence is all that is required to connect a particular defendant with the conspiracy.'" *Id.* at 467.  The district court in *Ashley* opined, "Further, even if this case does present circumstances of changing and overlapping membership and activities, they were all directed toward a common goal.  In such circumstances, 'most courts have found, as we do here, sufficient evidence to uphold a jury verdict reflecting a single conspiracy.'" 155 F.2d at 468, *citing United States v. Beasley*, 519 F.2d 233, 246 (5th Cir. 1975). In addition, "a co-conspirator is bound by the overt acts of other conspirators taken in furtherance of the conspiracy, whether or not said co-conspirator was a member of the conspiracy at the time . . . ." *Thomas*, 686 F. Supp. at 1088.

Conspiracy is a derivative tort because recovery is not based on the conspiracy, i.e., the agreement, but on the injury from the underlying tort, here allegedly fraud.  *Tilton v. Marshall*, 925 S.W. 2d 672, 681 (Tex. 1996).  "The gist of a civil conspiracy is the damage resulting from commission of a wrong which injures another, and not the conspiracy itself"; in other words, it is the injury resulting from an act done pursuant to the conspiracy's common purpose that gives rise to the cause of action, not the existence of the conspiracy itself.[10] *Schlumberger*

_____

[10] A key distinction between criminal and civil conspiracy is that unlike for a criminal conspiracy, for civil conspiracy the mere existence of a conspiracy is insufficient to constitute a claim; there must also be damages resulting from the commission of

*Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W. 2d 854, 856 (Tex. 1968); *see also Alford Chevrolet-Geo v. Jones*, 91 S.W. 3d 396, 403 (Tex. App.–-Texarkana 2002, pet. denied)(It is not the agreement, but the injury to the plaintiff from an act done pursuant to the common purpose that gives rise to a cause of action for civil conspiracy), *citing Carroll v. Timmers Chevrolet*, 592 S.W. 2d 922, 925 (Tex. 1979).   Therefore, under the allegations here, the wrong which JPMorgan Chase conspired with Enron to accomplish, i.e., Enron's fraudulent financial reporting to mislead the investing public and the credit rating agencies, must be shown to have proximately caused Plaintiffs' damages. Thus to be liable for conspiracy, a defendant must also participate to some degree in the underlying fraud.   *Id.*[11] Furthermore, to establish a conspiracy to defraud, the plaintiff must prove both a civil conspiracy and the underlying fraud. *Conger v. Danek Med., Inc.*, 27 F. Supp. 2d 717, 721-22 (N.D. Tex. 1998), *citing American Tobacco Co. V. Grinnell*, 951 S.W. 2d 420, 438 (Tex. 1997).

Proximate cause is composed of two elements, cause-in-

---

a wrong which injures another. *See, e.g., Belz v. Belz*, 667 S.W. 2d 240, 243 (Tex. App.–Dallas 1984), *citing Schlumberger*, 435 S.W. 2d at 856; *Starling v. Hill*, 121 S.W. 2d 648, 650 (Tex. Civ. App.–Waco, 1938, no writ).

[11]   Furthermore, if a plaintiff cannot adequately allege with particularity or ultimately prove an element of the underlying fraud, the conspiracy claim also fails.   *Hernandez v. Ciba-Geigy Corporation USA*, 200 F.R.D. 285, 292 (S.D. Tex. 2001); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 380 (5th Cir. 2004).   Under Rule 9(b), conspiracy to commit fraud must be pleaded with particularity as to time, place, and contents of false representations and the identity of the person making them and what he obtained thereby.   *Castillo v. First City Bancorporation of Texas, Inc.*, 43 F.3d 953, 961 (5th Cir. 1994).

fact and foreseeability. *City of Gladewater v Pike*, 727 S.W. 2d 514, 517 (Tex. 1987), *citing Williams v. Steves Industries, Inc.*, 699 S.W. 2d 570, 575 (Tex. 1985); *McClure v. Allied Stores of Texas, Inc.*, 608 S.W. 2d 901, 903 (Tex. 1980); and *Missouri Pac. R. Co. v. American Statesman*, 552 S.W. 2d 546, 549-50 (Tex. 1977).

"Cause in fact means that the omission or act involved was a substantial factor in bringing about the injury and without which no harm would have occurred." *Gladewater, 727 S.W. 2d at 517, citing McClure*, 608 S.W. 2d at 903. "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred." *Union Pump Co. v. Allbritton*, 898 S.W. 2d 773, 776 (Tex. 1995).

"Even if the injury would not have happened but for the defendant's conduct, the connection between the defendant and the plaintiff's injuries may be too attenuated to constitute legal cause." *Hunt*, 1999 WL 1201689, at *3 *(citing Union Pump Co. v. Allbritton*, 898 S.W. 2d 773, 775 (Tex. 1995)("At some point in the causal chain the defendant's conduct may be too remotely connected with the plaintiff's injury to constitute legal causation," a determination that "'mandates weighing of policy considerations [citations omitted].'")), *abrogated on other grounds, Ford Motor Co. v. Ledesma*, 242 S.W. 3d 32 (Tex. 2007).

"Foreseeability requires that the actor, as a person of

ordinary intelligence, would have anticipated the danger that his
. . . act created for others." *City of Gladewater,* 727 S.W. 2d
at 517*, citing Nixon v. Mr. Property Management Co., Inc.*, 690
S.W. 2d 546, 549-50 (Tex. 1985).  "Foreseeability does not require
the actor to anticipate the manner in which injury will occur."
*Univ. Preparatory School v. Huitt*, 941 S.W. 2d 177, 180 (Tex.
App.--Corpus Christi 1996, writ denied).  "All that is required
is that the injury be of such a general character as might
reasonably have been anticipated, and the injury should be so
situated with relation to the wrongful act that the injury to him
or to one similarly situated might reasonably have been foreseen."
*Id.*  "Proximate cause cannot be satisfied by mere conjecture,
guess, or speculation."  *IHS Cedars Treatment Center of DeSoto
Texas, Inc. v. Mason*, 143 S.W. 3d 794, 798-99 (Tex. 2003); *Doe v.
Boys Club of Greater Dallas, Inc.*, 907 S.W. 2d 472, 477 (Tex.
1995).

     "There can be more than one proximate cause of an
event."  *Olson*, 980 S.W. 2d at 893; *see also Travis v. City of
Mesquite*, 830 S.W. 2d 94, 98 (Tex. 1995).  Under Texas law a
plaintiff does not need direct evidence to satisfy causation.
*Tomkins v. Cyr*, 202 F. 3d 770, 782 (5th Cir. 2000).
"Circumstantial evidence and reasonable inferences therefrom are
a sufficient basis for a finding of causation."  *Id., citing Texas
Dept. of Transportation v. Olson*, 980 S.W. 2d 890, 893 (Tex. App.-
-Fort Worth 1998), *citing Havner v. E-Z Mart Stores, Inc.*, 825
S.W. 2d 456, 459 (Tex. 1992).  "Establishing causation requires
facts sufficient for the fact-finder reasonably to infer that the
defendants' acts were a substantial factor in bringing about the

injury." *Id., citing Purina Mills, Inc. v. Odell*, 948 S.W. 2d
927, 936 (Tex. App.--Texarkana 1997).

Whether something constitutes a proximate cause of an
event is a question "of fact particularly within the province of
a jury." *Olson*, 980 S.W. 2d at 893; *see also El Chico Corp. v.
Poole*, 732 S.W. 2d 306, 314 (Tex. 1987); *Strakos v. Gehring*, 360
S.W. 2d 787, 792 (Tex. 1962).  It can be a question of law for the
court where there is no material dispute about the evidence and
the circumstances are such that reasonable minds could not come
to a different conclusion.  *Hunt v. Killeen Imports, Inc*., No. 03-
99-00093-CV, 1999 WL 1201689, *3 (Tex. App.--Austin Dec. 16, 1999,
pet. denied), *citing Missouri Pac*. *R.R. Co. v. American Statesman*,
552 S.W. 2d 99, 104 (Tex. 1977).  It may also be a question of law
for the court when the relationship between the defendant's acts
or omissions and the plaintiff's injuries is attenuated or remote.
*Id., citing Lear v. Siegler*, 819 S.W. 2d 470, 472 (Tex. 1991).

Typically a conspiracy is proved by circumstantial
evidence.  *Schlumberger*, 435 S.W. 2d at 858, *citing Jernigan v.
Wainer*, 12 Tex. 189 (1854).[12]  "Circumstantial evidence may be used
to establish any material fact, but it must constitute more than
mere suspicion." *Transport*, 898 S.W. 2d at 278*, citing Browning
-Ferris, Inc*. *v. Reyna*, 865 S.W. 2d 925, 927-28 (Tex. 1993)("some
suspicion linked to other suspicion produces only more suspicion,
which is not the same as evidence."); *Schlumberger*, 435 S.W. 2d
at 858 ("vital facts may not be proved by unreasonable inferences

---

[12] Intent to defraud, however, must be established by "full,
clear, satisfactory and convincing testimony." *Riquelme Valdes v.
Leisure Res. Group, Inc*., 810 F. 2d 1345, 1351 (5th Cir. 1987).

from other facts and circumstances"; any vital fact must be proved "by evidence amounting to something more than a mere scintilla"). Where the circumstantial evidence is meager, "if 'circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred.'" *Transport Ins.*, 898 S.W. 2d at 278, *quoting $56,700 in U.S. Currency v. State*, 730 S.W. 2d 659, 662 (Tex. 1987). Circumstantial evidence can include acts by or statements of the alleged conspirators. *International Bankers Life Ins. Co. v. Holloway*, 368 S.W. 2d 567, 581-82 (Tex. 1963)("The general rule is that conspiracy liability is sufficiently established by proof showing concert of action or other facts and circumstances from which the natural inference arises that the unlawful overt acts were committed in furtherance of common design, intention, or purpose of the alleged conspirators. . . . . It is not required that each and every act of a conspirator be shown to have been in concert with the others or that it be established by direct evidence that all combined at a give time prior to each transaction. Inferences of concerted action may be drawn from joint participation in the transactions and from enjoyment of the fruits of the transactions.").

"Once a conspiracy is proven, each co-conspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.'" *Carroll v. Timmers Chevrolet*, 592 S.W. 2d 922, 926 (Tex. 1979)(*quoting State v. Standard Oil Co.*, 130 Tex. 313, 329, 107 S.W. 2d 550, 559 (1937)); *Akin v. Dahl*, 661 S.W. 2d 917, 926 (Tex. 1983). On the other side of the coin, "an alleged conspirator is not liable for an act not

done in pursuance of the common purpose of the conspiracy."
*Carroll*, 592 S.W. 2d at 928.   A finding of civil conspiracy
imposes joint and several liability on all conspirators for actual
damages resulting from acts in furtherance of the conspiracy.
*Carroll*, 592 S.W. 2d at 925.   "[C]ivil conspiracy 'came to be used
to extend liability in tort . . .  beyond the active wrongdoer to
those who have merely planned, assisted, or encouraged his acts.'
Once a conspiracy is proven, each co-conspirator 'is responsible
for all acts done by any of the conspirators in furtherance of the
unlawful combination.'"   *Id.* at 925-26, *quoting* W. Prosser,
*Handbook of the Law of Torts* § 46 at 293 (1971), and *State v.
Standard Oil Co.*, 130 Tex. 313, 107 S.W. 2d 550, 559 (1937).

### B.   Standard of Review

Summary judgment under Federal Rule of Civil Procedure
56(c) is appropriate when "the pleadings, depositions, answers to
interrogatories and admissions on file, together with the
affidavits, show that there is no genuine issue as to any material
fact and that the moving party is entitled to judgment as a matter
of law."   A dispute of material fact is "genuine" if the evidence
would allow a reasonable jury to find in favor of the nonmovant.
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
Initially the movant bears the burden of identifying those
portions of the pleadings and discovery in the record that it
finds demonstrate the absence of a genuine issue of material fact;
the movant may, but is not required to, negate elements of the
nonmovant's case to prevail on summary judgment.   *Celotex Corp.
v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife
Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit,*

*Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323. "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'" *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986). "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'" *Id., quoting Liberty Lobby*, 477 U.S. at 252. The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'" *Id., quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986). Conclusory allegations unsupported by evidence will not preclude summary judgment. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 712-13.

### C.  Defendant's Summary Judgment Argument (#99 and 100)

Defendant contends that it is entitled to summary judgment as a matter of law because Plaintiffs cannot demonstrate proximate causation for their statutory fraud and conspiracy-to-commit-fraud claims.

Defendant insists that Plaintiffs fail to present any evidence that JPMorgan Chase caused Plaintiffs' losses, an essential element of these causes of action. *See Mumphord v. First Victoria Nat'l Bank*, 605 S.W. 2d 701, 704 (Tex. Civ. App.--Corpus Christi 1980)("There must be pleading and proof of a pecuniary loss suffered which is directly traceable to and which resulted from the false representation upon which the injured party relied."); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 310 F. Supp. 2d 819, 831 (S.D. Tex. 2004)("'Similar to loss causation, the proximate cause element of common law fraud requires that plaintiff adequately allege a causal connection between defendants' nondisclosures and the subsequent decline in the value of [the] securities.'"), *quoting Emergent Capital Management., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

Defendant insists that Plaintiffs must demonstrate that Defendant's wrongful conduct (either by engaging in a series of structured transactions that were purportedly improperly accounted for by Enron or by engaging in a series of transactions that deprived Enron of sufficient funds to remain afloat in 2001) caused the decline in Enron's stock price, as well as Enron's inability to repay its debt obligations. Defendant charges that despite intensive fact discovery, Plaintiffs have failed to do so.

Furthermore, Defendant argues, when a plaintiff's alleged injury is complex, as here, lay testimony is insufficient; testimony is required to prove proximate causation. *Praytor v. Ford Motor Co.*, 97 S.W. 3d 237, 241 (Tex. App.--Houston [14[th] Dist.] 2002)("To establish causation, a plaintiff must prove the defendant's conduct caused an event and that event caused the plaintiff to suffer compensable damages. The causal link between the event sued upon and the plaintiff's injuries must be shown by competent evidence. Lay testimony will suffice when general experience and common sense will enable a lay person fairly to determine the causal nexus. [citations omitted]"). *See also Mack Trucks, Inc. v. Tamez*, 206 S.W. 3d 572, 583 (Tex. 2006)("Proof other than expert testimony will constitute some evidence of causation only when a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition. Expert testimony is required when an issue involves matters beyond jurors' common understanding."); *Brown v. Rreef Management Co.*, No. 05-06000942-CV, 2007 WL 1829725, at *1 (Tex. App.--Dallas June 27, 2007)("When

a lay person's general experience and common sense will not enable that person to determine causation, expert testimony is required."). It is well established that injuries arising from securities fraud cases are complex. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 413 (5th Cir. 2001); *In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 571 (E.D. Tex. 2005). To hold JPMorgan Chase liable, Defendant maintains that competent expert testimony is required to demonstrate that the loss in value of Plaintiffs' Enron securities is directly attributable to JPMorgan Chase's actions or transactions in this complex case, in which Plaintiffs "have alleged myriad misstatements by Enron and others as a result of scores of transactions and analyst reports, any one of which could have caused all or none of Plaintiffs' losses." #100 at 16. They have failed to meet this requirement.

Defendant highlights the district court opinion, following remand from the Fifth Circuit, in *In re Zonagen, Inc., Sec. Litig.*, 311 F. Supp. 2d 764 (S.D. Tex. 2003). In *Zonagen*, the district court granted summary judgment for the defendants on federal securities claims because the record was "almost entirely devoid of any proof of loss causation." *Id.* at 781. The court determined that although the plaintiffs provided expert testimony that generally spoke to the effect of a report on the company's stock price, the expert did not address whether defendants' particular misstatements had any effect on the stock. *Id.* In particular, the court found that the expert's opinion was deficient for failure to "undertake an independent statistical analysis" to determine how the specific misstatements at issue affected the stock price when made or "to determine whether and

how much any other event might have increased or decreased [the company's] stock price." *Id.* at 782.  Thus the expert's opinion "d[id] not constitute evidence of loss causation." *Id.*

Defendant contends that this is a complex case in which Plaintiffs have alleged numerous misstatements by Enron and others as a result of scores of transactions and analyst reports, any one of which could have caused all or none of Plaintiffs' losses. Plaintiffs' claim depends on demonstrating the loss in value of Plaintiffs' Enron securities that is directly attributable to Defendant.  Pointing to the transcript of Plaintiffs' expert Dr. Kenneth McCoin's testimony, Defendant further observes that Dr. McCoin, did not opine on causation; indeed when specifically asked whether he had analyzed causation or otherwise determined who or even whether anyone was responsible for Plaintiffs' losses, Dr. McCoin unambiguously responded in the negative.  #100 at 16-17.

Defendant contends that to avoid summary judgment, Plaintiffs must, but have failed to, demonstrate through fact witnesses, documents, or expert witnesses, that, among the myriad other factors that in any way caused Enron to collapse into bankruptcy, Defendant's alleged wrongdoing (engaging in a series of structured finance transactions that purportedly were improperly accounted for by Enron or engaging in a series of transactions that deprived Enron of enough funds to remain operative in late 2001) directly caused the decline in Enron's stock price and Enron's inability to repay its debt obligations.

For all these reasons Defendant requests the Court to grant its motion for summary judgment on Plaintiffs' statutory fraud and conspiracy to defraud claims against JPMorgan Chase.

### D.  Plaintiffs' Response (#105)

Plaintiffs reject as "flawed" Defendant's argument that Plaintiffs must prove that JPMorgan Chase's structured finance transactions, which allegedly were improperly accounted for by Enron, or transactions that deprived Enron of sufficient funds to remain operating in late 2001 caused the price of Enron's stock to decline, rendered Enron unable to repay its debt obligations, and resulted in Enron's collapse.  Plaintiffs also disagree with JPMorgan Chase's contention that Plaintiffs need a causation expert to prove their claims.  They insist that while "parts" of Defendant's "causation theory are arguably relevant to a federal securities section 10(b) claim or a common law simple fraud claim, the theory is wholly inapplicable to their Texas causes of action, and thus not material, to Plaintiffs' live causes of action." #105 at 3.  In sum, they contend that Defendant fails to make a legal argument that would support summary judgment.

Because Plaintiffs are alleging that Defendant is a **secondary** violator under section 27.01(d) and that Enron is a co-conspirator in a common-law conspiracy, Plaintiffs maintain that they need only demonstrate that their losses were caused by **Enron**'s actionable false representations, and not by Defendant's transactions or misrepresentations. *See Mumphord*, 405 S.W. 2d at 704 (plaintiffs must plead and prove "a pecuniary loss suffered . . . which resulted from the *false representations* upon which the injured party relied").  Plaintiffs have clearly alleged that they relied on misrepresentations by Enron and by rating agencies that were also duped by Enron, both of which are actionable when Enron is a co-conspirator or when Defendant committed a secondary

violation of the fraud statute, section 27.01(d), premised on Defendant's wrongful silence.[13]

Plaintiffs' conspiracy-to-commit-fraud claim does not depend on JPMorgan Chase's misrepresentations to Plaintiffs. The correct analysis is whether Plaintiffs' losses are attributable to actionable false statements (or fraudulent nondisclosure) by any co-conspirator. Plaintiffs insist that they only need to show that the damages were the proximate result of the *conspiracy's* conduct, and not that Defendant's transactions and/or misrepresentations directly caused Enron's collapse. *Potash Corp. of Saskatchewan, Inc. v. Mancias*, 942 S.W. 2d 61, 65 (Tex. App.- -Corpus Christi 1997, no writ)(to demonstrate causation, a plaintiff must show that his damages were proximately caused by a conspiracy to commit unlawful acts in order to accomplish a particular object."), *citing Juhl v. Airington*, 936 S.W. 2d 64, 644-45 (Tex. 1996). "Once a civil conspiracy is found, each co-conspirator is responsible for the action of any of the co-conspirators which is in furtherance of the unlawful combination." *Akin v. Dahl*, 661 S.W. 2d 917, 921-22 (Tex. 1962)(citing *Carroll v. Timmers Chev., Inc.,* 592 S.W. 2d 922, 926 (Tex. 1979)). Thus because Defendant participated in the conspiracy, Defendant is liable for Enron's acts, made in furtherance of a plan to falsify Enron financial statements. *Bentley v. Bunton*, 94 S.W. 3d 561, 619 (Tex. 2002)("A person who joins in a conspiracy is jointly and severally liable 'for *all acts done by any of the conspirators* in

---

[13] Plaintiffs emphasize that JPMorgan Chase does not contend that Defendant lacked a duty to disclose.  Nor does it challenge any elements of Enron's primary violation of the statute.

furtherance of the unlawful combination.' . . . . All the plaintiff must show for the alleged conspirators to be held jointly and severally liable is that they 'acted in pursuance of the common purpose of the conspiracy.'"), *citing Carroll*, 592 S.W. 2d at 926, 928.  *See Bentley*, 94 S.W. 3d at 619 ("[O]ur jurisprudence does not require the trial court to separately submit each co-conspirators's civil conspiracy damages.  When the jury found that liability for a civil conspiracy existed, this finding requires the legal conclusion to impose joint and several liability on the co-conspirators.").[14]  The Texas Supreme Court further stated, "Thus if a conspiracy is proven, it can extend liability in tort beyond the active wrongdoer to those conspirators who may have merely planned, assisted, or encouraged the wrongdoer's acts."  *Bentley*, 94 S.W. 3d at 619, *citing Carroll*, 592 S.W. 2d at 926.  They conclude that JPMorgan Chase is responsible for Enron's acts in furtherance of Enron and Defendant's agreement to falsify Enron's financial statements; a co-conspirator does not have to participate in every fraudulent act to be liable for the damages caused by the conspiracy. Plaintiffs charge that Defendant seeks summary judgment on an incorrect construction of the law of conspiracy.

---

[14] Plaintiffs argue, "Under the logic of JPMC's novel causation theory, no co-conspirator would ever be liable in Texas unless its assistance in the scheme was so great that it constitutes a separate or independent proximate cause of the injury--in which case, the co-conspirator would generally be directly liable for its own acts and the conspiracy cause of action would be pointless.  In a conspiracy, the get-away driver is liable for the bank robbery even if he did not remove money from the bank vault.  Similarly, the co-conspirator that helped Enron secretly cook its books is liable even if the co-conspirator did not publish the cooked financial results."  #105 at 9.

Plaintiffs also insist that Section 27.01(d) liability does not depend on Defendant's transactions or misrepresentations to Plaintiffs. Plaintiffs do not need to show that Defendant's bad acts caused Enron's collapse. Plaintiffs need only first demonstrate that Enron committed a primary violation of section 27.01, and then show Defendant's secondary violation under section 27.01(d). Defendant has not challenged any element of Enron's alleged primary violation.[15] Defendant's only conduct relevant to the section 27.01(d) claim is Defendant's wrongful silence regarding its actual awareness of Enron's fraudulent statements; evidence of Defendant's transactions and misrepresentations are not material to the statutory claim.

With respect to a causation expert, Plaintiffs claim that Defendant fails to cite applicable law for the need for one where, as here, Plaintiff's injuries, i.e., monetary losses, are not complicated.[16] Plaintiffs are not addressing complicated

---

[15] Regarding the elements of a secondary violation of section 27.01 (see pages 7-8), Plaintiffs point out that (1) Defendant does not dispute or demand proof that Defendant knew Enron was cooking its books and making false representations in financial statements; (2) Defendant does not deny that it had a duty to disclose that arose from publication of analyst reports containing half-truths and incorrect financial data about Enron and which conveyed a false impression of Enron's financial health, nor dispute that Defendant failed to disclose the falsity of Enron's accounting and reported finances until various governmental investigations were commenced after Enron filed for bankruptcy; and (3) Defendant does not allege that Plaintiffs are unable to raise a fact issue showing that Defendant benefitted from its silence by a continuing flow of profitable business from, and promises of future business with, Enron.

[16] Plaintiffs agree that accounting issues are complicated and are typically the only areas requiring an expert in a securities suit. *SEC v. Johnson*, 525 F. Supp. 2d 70, 77 (D.D.C. 2007)(striking expert's causation opinions because determinations were common sense and within the ken of the jury, but finding

accounting issues.  Furthermore they charge that Defendant ignores opinions of three of Plaintiffs' experts that raise genuine issues of a material fact about the causes of Plaintiffs' damages.  #105, Exhibits A-F.

Instead Defendant relies on a number of federal securities class actions based on the "fraud-on-the-market" presumption of reliance for a section 10(b) claim,[17] a theory that has never been adopted under Texas law, emphasize Plaintiffs. Plaintiffs further note that while a fraud-on-the-market theory frequently requires statistical evidence from an expert, such as an event study, Plaintiffs do not base their claims on such a theory of reliance.  This Court has found no Texas cases that require the type and degree of evidence now mandated by the Fifth Circuit in federal securities actions to establish a presumption of reliance under a fraud on the market theory.  *See, e.g., Greenberg v. Crossroads System, Inc.*, 364 F.3d 657 (5th Cir. 2004); *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 1007).  Thus Plaintiffs conclude that federal decisions dealing with that fraud-on-the-market theory do not support Defendant's contention that Plaintiffs need a causation expert.

Plaintiffs insist, "No expert is required to explain

_____

expert testimony admissible for general financial reporting requirements, accounting principles, materiality, conduct of audits, etc.  because they "are not the type of knowledge within the 'ken' of the average juror, and such testimony is unquestionably relevant to the various accounting issues at play in this case.").

[17] Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).

that, if a company cooks its books to greatly inflate the value
of its securities, a foreseeable result is a dramatic decline in
the value of these securities, causing harm to the plaintiff, when
the truth comes out."  #105 at 14.  *See, e.g., Hamburger v. State
Farm Mutual Auto. Ins.*, 361 F.3d 875, 884 (5th Cir. 2004)("Under
Texas  law,  '[l]ay  testimony  is  adequate  to  prove  causation  in
those  cases  in  which  general  experience  and  common  sense  will
enable  a  layman  to  determine,  with  reasonable  probability,  the
causal  relationship  between  the  event  and  the  condition.'  .  .  .
'Generally,  lay  testimony  establishing  a  sequence  of  events  which
provides  a  strong,  logically  traceable  connection  between  the
event  and  the  condition  is  sufficient  proof  of  causation.'  .  .  .
Therefore  in  determining  whether  lay  testimony  is  sufficient  to
prove  causation,  Texas  courts  look  at  the  nature  of  the  lay
testimony  and  the  nature  of  the  injury."),  *quoting Morgan v.
Compugraphic Corp.*, 675 S.W. 2d 729, 733 (Tex. 1984); *Qualls v.
State  Farm  Lloyds*,  226  F.R.D.  551,  555  (N.D.  Tex.  2005)("In
determining  whether  expert  testimony  is  necessary  to  establish
negligence,  Texas  courts  have  considered  whether  the  conduct  at
issue  involves  the  use  of  specialized  equipment  and  techniques
unfamiliar  to  the  ordinary  person.").

     Regardless  Plaintiffs  insist  their  three  experts,  one
in  accounting  (Paul  Regan)  and  two  in  investment  banking  (William
Purcell  and  Professor  Anthony  Saunders),  addressed  the  elements
of  proximate  cause,  submitted  expert  reports,  participated  in
depositions,  and  opined  that  Plaintiffs'  losses  were  foreseeable
and  that  Defendant's  conduct  was  a  substantial  factor  in  bringing
about  Plaintiffs'  injury  in  fact.   See  exhibits  A-F  attached  to

#105.  They cite specific parts of the exhibits in support.

### E.  Defendant's Reply (#109)

Defendant contends that Plaintiffs have misrepresented Defendant's argument, which is not that Plaintiffs must prove that Defendant's transactions caused Enron's collapse, but rather that Plaintiffs' claims must be dismissed because they have not shown that their losses were caused by Defendant's purported fraudulent transactions with Enron.   While this causation standard might encompass misstatements or omissions by Enron as well as by Defendant, it does not encompass misstatements by Enron about transactions or activities that have no connection to JPMorgan Chase; "JPMorgan Chase cannot be held liable for Enron's myriad business failures, of which it had no connection or no knowledge, or for Enron's purportedly fraudulent transactions with other entities, which again, it had absolutely nothing to do with." #109 at 1.   Defendant insists that "under the correct legal standard, Plaintiffs must at minimum show that the misstatements or omissions made either by JPMorgan Chase or by Enron in connection with JPMorgan Chase's transactions proximately caused their losses."  *Id.* at 3.

Defendant notes that Plaintiffs do not dispute that proximate causation is an element of their remaining two claims, but instead contend that they need only show Enron's alleged misstatements caused their losses.  Under Texas law of conspiracy, a defendant is not liable if it lacks knowledge of the alleged harmful acts that are the aim of the conspiracy.  *Firestone Steel Prods. Co. v. Barajas*, 927 S.W. 2d at 614 ("Civil conspiracy requires specific intent.  One cannot agree, expressly or tacitly,

to commit a wrong about which he has no knowledge.  One without knowledge of a conspiratorial plan or scheme to injure another by the commission of a particular wrong cannot share the intent to injure such other. [citations omitted]"). "An alleged conspirator is not liable for an act not done in pursuance of the common purpose of the conspiracy." *Carroll*, 592 S.W. 2d 922, 928. *See also Great Nat'l Life Ins. Co. v. Chapa*, 377 S.W. 2d 632, 635 (Tex. 1964)("[A]n act done or a declaration made by one conspirator not in pursuance of the common object is not evidence against his co-conspirators."). Texas case law does not hold a defendant liable for losses caused by events unrelated to the conduct plaintiffs allege the defendant to have participated in or of which it had no knowledge.  Thus Defendant argues that JPMorgan Chase cannot be held responsible for such matters as the failure of Enron's broadband business or losses is connection with Enron's investment in the Dabhol power plant in India or for Enron's alleged fraudulent accounting of transactions with other banks.  Plaintiffs charge that Enron and JPMorgan Chase engaged in a conspiracy by entering into a specific and identified series of fraudulent transactions, but Plaintiffs have made no showing that these specific transactions, as opposed to Enron's transactions with other entities, caused Plaintiffs' losses. Plaintiffs' conclusory allegations that their losses were caused by Enron's incorrect accounting for JPMorgan Chase transactions or that they were induced to purchase Enron securities on the basis of such accounting are inadequate; they must demonstrate with competent evidence a causal connection between Enron's allegedly improper accounting for JPMorgan Chase's transactions

and the subsequent decline in the value of their securities. *Hayden v. Dunlap*, 84 S.W. 2d 306, 310 (Tex. Civ. App. 1935)(Plaintiff must establish "not only the fraudulent representations . . . as pleaded, but also the causal connection between such representations and the damages sustained."); *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 310 F. Supp. 2d 819, 831 (S.D. Tex. 2004)("'Similar to loss causation, the proximate cause element of common law fraud requires that plaintiff adequately allege a causal connection between the defendants' nondisclosures and the subsequent decline in the value of . . . [the] securities.'").

Similarly, a defendant can only be liable for a violation of section 27.01(d) if it "ha[d] actual awareness of the falsity of [the] representation or promise"; this knowledge requirement limits JPMorgan Chase's liability to misrepresentations made by Enron in connection with transactions involving JPMorgan Chase. Like the proximate causation requirement for conspiracy, this provision forecloses liability under section 27.01(d) for conduct unrelated and unknown to Defendant.

Defendant asserts that Plaintiff offers no evidence of causation with respect to either of the remaining two claims. None of the numerous lines of expert testimony cited by Plaintiffs show any causal connection between Enron's accounting for JPMorgan Chase's transactions and the decline in value of Plaintiffs' Enron securities. At best the expert testimony touches only upon foreseeability; nothing relates to cause in fact. Saunders, Purcell, and Regan do not analyze whether Plaintiffs' losses were

in fact caused by Enron's allegedly incorrect accounting for its transactions with Defendant.[18]   Defendant notes that even if the Court should find that expert evidence is not required here, summary judgment is still appropriate because the factual record is equally deficient in establishing proximate causation.   #109 at 9 n.4.

Expert evidence is needed here, insists Defendant, because the reasons behind Enron's collapse and eventual bankruptcy are complicated and beyond the ken of the average juror.  Observing that to make a determination about causation here, a jury would have to decide whether investors' losses in fact were caused by Enron's accounting for JPMorgan Chase's transactions, for other entities' transactions with Enron, for losses sustained as part of Enron's many business failures, or none of these.  Defendant does not argue that Plaintiffs have to have a separate causation expert, but only some expert testimony supporting Plaintiffs' insistence that Enron's accounting for JPMorgan Chase's transactions caused their losses.   Defendant maintains that case law rejects Plaintiffs' argument that this case is not complex because it involves monetary damages.  *See, e.g., Board of Trustees of Fire & Police Retiree Health Fund v. Towers, Perrin, Foster & Crosby*, 191 S.W. 3d 185, 190 (Tex. App.-

---

[18] Defendant argues that Saunders addresses only the alleged illegality of JPMorgan Chase's transactions with Enron; Purcell discussed only whether JPMorgan had knowingly assisted Enron in misrepresenting Enron's accounting and whether such misrepresentations were substantial and material to investors; and Regan focused on whether JPMorgan Chase knowingly aided Enron in understating its debt, inflating Enron stock prices, and misrepresenting financial information.  #109 at 8 (citing passages of their depositions attached as exhibits to #105, supported by the affidavit of Jelayne Hoffman).

–San Antonio 2005)("In an accountant malpractice case, '[e]xpert testimony is usually necessary to establish . . . the causal link between the plaintiff's damages and the accountant's negligence.'"); *Greenstein, Logan & Co. v. Burgess Marketing, Inc.*, 744 S.W. 2d 170, 185 (Tex. App.--Waco 1987)("Expert testimony is usually necessary to establish the requisite standard of care and skill, a departure from that standard, and the causal link between the plaintiff's damages and the accountant's negligence.").

Defendant emphasizes that the issue of causation is critical here since the Plaintiffs have separately in other suits sought to hold multiple parties responsible for their losses, i.e., a myriad of potential causes of Plaintiffs' losses.[19] *Byrd v. Delasancha*, 195 S.W. 3d 834, 838-39 (Tex. App.--Dallas 2006)(distinguishing cases requiring expert testimony as to proximate causation because they involved "multiple causes" of plaintiff's injuries such that a lay person's "general experience

---

[19] Plaintiffs respond,

> To the extent "other parties" conspired with Enron to falsify Enron's financial records, there is no impact on JPMC's liability because JPMC need not know the identity of others who agreed to the object of the conspiracy, or know precisely the acts of the others performed in furtherance of the conspiracy's goal. If JPMC contends there are some particular grounds for alleging indemnification, contribution or some other basis for diminution in liability or damages, JPMC may bring--and indeed has brought--third party claims against putatively liable parties. . . .

#112 at 26 n.18. Under section 27.01(d), once Plaintiffs demonstrate the elements of Defendant's secondary violation, its liability, under the statute, is the same as Enron's. *Id.*

and common sense" were inadequate to determine causation), *citing Morgan v. Compugraphic Corp.*, 675 S.W. 2d 729, 734 (Tex. 1984).

### F.  Plaintiffs' Surresponse (#112)

Plaintiffs object that JPMorgan Chase's theory, based on elements of common law simple fraud or federal securities fraud, does not apply to Plaintiffs' conspiracy-to-defraud claim or to their secondary violation statutory fraud claim.  In suggesting there were other causes of Enron's claim, Defendant misses the crux of Plaintiffs' causes of action, i.e., that Enron's business failures were precisely the financial disasters that the conspiracy successfully sought to conceal.

Defendant, as Movant, has the initial burden to identify a valid legal theory for summary judgment, but, argue Plaintiffs, the one it proposes is contrary to controlling law; therefore Defendant's motion must be denied as a matter of law

Plaintiffs maintain that Defendant mischaracterizes the law, in particular in its assertions (1) that to prove their conspiracy claims, Plaintiffs must show losses that were caused by Enron's improper accounting **for JPMorgan Chase's** transactions with Enron, and (2) that section 27.01(d)'s knowledge requirement limits Defendant's liability to misrepresentations made by Enron **involving Defendant only**.  Defendant cites no statutory or decisional law to support its view.  To the contrary, Plaintiffs maintain that the governing conspiracy decisional law imposes joint and several liability on all co-conspirators, while the section 27.01 imposes the same liability on the secondary violator as it imposes on the primary violator.  Plaintiffs insist they therefore are not required to show that Defendant's transactions,

by themselves, caused Plaintiffs' damages--such a requirement would nullify Texas' long established common law of conspiracy and eliminate secondary liability under the fraud statute.[20]

Plaintiffs contend that under Texas conspiracy law once two or more parties have a meeting of the minds and agree upon a course of conduct or aim that is contrary to the law, all acts in furtherance of the conspiracy create liability for all conspirators. *Holloway v. Int'l Bankers Life Ins. Co.*, 354 S.W. 2d 198, 216 (Tex. Civ. App.--Fort Worth 1962), *rev'd on other grounds*, 368 S.W. 2d 567 (Tex. 1963). The gist of a civil conspiracy is "the damage resulting from the commission of a wrong which injures another, and not the conspiracy itself." *Schlumberger Well Surveying Corp.*, 435 S.W. 2d at 856. Defendant's role in causation was in agreeing to pursue and in participating in acts in furtherance of the scheme to help Enron cook its books and file falsified financial statements with the SEC. All of Enron's conduct in furtherance of this goal, not just its transactions with JPMorgan Chase, results in liability for co-conspirator JPMorgan Chase. As the Texas Supreme Court stated in *Bentley*, 94 S.W. 3d at 519, "All the plaintiff must show for the alleged conspirators to be held jointly and severally liable is that they acted in pursuance of the common purpose of the conspiracy." *See also Viera v. State*, 245 S.W. 2d 257, 259 (Tex. Crim. App. 1951)("Everyone who does enter into a common purpose or design is generally deemed in law a party to every act which

---

[20] Plaintiffs suggest that Defendant is urging some kind of "pro rata share" liability for co-conspirators and secondary statutory fraud violators.

has before been done by others, and to every act which many afterwards be done by any of the others, in furtherance of such common design" [citation omitted].); *U.S. v. Capo*, 791 F. 2d 1054, 1066 (2d Cir. 1986)(a co-conspirator "may participate in a conspiracy without knowing the identities of all other co-conspirators"), *vacated on other grounds*, 817 F.2d 947 (2d Cir. 1987); *U.S. v. Spudic*, 795 F. 2d 1223, 1337 (7th Cir. 1986)("A co-conspirator need not be, and often is not, aware of everything being done to further the conspiracy."); *Carrion v. State*, 802 S.W. 2d 83, 91 (Tex. App.--Austin 1990, no writ)(a co-conspirator "may enter into a conspiracy after its formation and while it is in progress and participate in the common design and be responsible for acts done in furtherance of the conspiracy.").

          As for the statutory fraud claim Plaintiffs argue that Defendant's silence (despite its knowledge, duty to disclose, failure to disclose, and benefit from nondisclosure) created liability under the express language of section 27.01(d).  They insist they are not required to show Defendant's misstatements, only its silence.  Because defendant is liable under section 27.01(d) only as a secondary actor involved in transactions that purportedly helped Enron to falsify its financial statements, only Enron's false misrepresentations (which Defendant does not challenge) are at issue.  *In re Enron Corp. Litig. (American Nat'l Ins. v. J.P. Morgan Chase & Co.)*, 388 F. Supp. 2d 780, 788 (S.D. Tex. 2005)("In addition to imposing liability on a person making misrepresentations, section 27.01 also contains a provision imposing liability for actual and exemplary damages on a person who knows of another's misrepresentation, fails to disclose the

falsity to the defrauded person, and benefits from the misrepresentation."). Thus Defendant's argument that section 27.01(d)'s knowledge requirement limits Defendant's liability to misrepresentations made by Enron involving Defendant is contrary to well-established law.

For causation, Plaintiffs re-urge that the same evidence (including emails, memoranda, transcripts of telephone communications, deposition testimony, and various other documents), which Defendant identifies and discusses (#112 at 9-22, with attached exhibits), for both the "meeting of the minds" element of their conspiracy-to-defraud claims and for the element of Defendant's "actual knowledge" of Enron's falsification of financial statements for their section 27.01(d) claims. #112 at 9-30 and attached exhibits.

Not only do Plaintiffs present factual evidence to defeat summary judgment, but they further assert that Defendant's arguments about expert testimony lack merit. Plaintiffs' experts analyzed and explained in ways a jury could understand the complex accounting methods and structured finance information used by Enron and Defendant that permitted Enron to report false financial results. Response, Exhibits A-F. Without further expert evidence, a jury could easily conclude that purchasers of Enron securities, who bought at artificially inflated prices, would face losses when the truth came out. Given correct interpretation of the law of civil conspiracy and statutory fraud, Plaintiffs' experts did not need to examine Enron's various business failures to determine which of Enron's business problems caused Enron's collapse because they are irrelevant.

Regarding Bankruptcy Examiner Neal Batson's reports, Plaintiffs points out that *In re FiberMark* is the only decision addressing whether such reports are admissible as expert opinion over a hearsay objection.  They maintain that the *FiberMark* court ruled that bankruptcy examiner reports are admissible. 339 B.R. 321, 327 (Bkrtcy. D. Vt. 2006).[21]

_____

[21] Plaintiffs simplify the substance of this decision.  In *FiberMark*, on motion of the Trustee and agreement of the parties and after assuring herself of Harvey R. Miller's competence and disinterestedness, Bankruptcy Judge Colleen A. Brown appointed Mr. Miller to serve as Examiner to investigate matters of the debtor's estate, including fraud, dishonesty or gross management.  339 B.R. at 323-24. In particular she appointed Miller to investigate the motives of parties involved in the bankruptcy case and to determine whether any breaches of fiduciary duty had occurred.  She explained in her decisions that an examiner "answers solely to the court and is required to file a report of his or her investigation with the court," but that the "examiner's findings have no binding effect on the court."  *Id.* at 325.  Miller subsequently produced a 298-page report which the reorganized debtor sought to have admitted into evidence as an expert opinion.

Since Miller was not addressing purely objective issues based on objective data from his area of expertise, Judge Brown opined that the examiner's report factually "paints a picture [of] his . . . image of what happened" from hearsay materials, i.e., out-of-court statements from interviews that "lack the indices of reliability for admission into evidence under the Federal Rules" and that "the factual portions of his report contained an abundance of statements that [were] the purest sort of hearsay."  *Id.* at 325-27.  "The facts, as found by the Examiner, are not 'true' just because they are in the Report.  They explain and justify the Examiner's conclusions.  That is all.  The Examiner's rendition of the facts may not be relied upon to prove the truth of the matter asserted."  *Id.* at 317.  The parties seeking to use the report's factual findings in the case would have to demonstrate that the report is admissible under the Federal Rules of Evidence.

Nevertheless, where the Examiner is shown to be qualified as an expert in the field at issue (see Fed. R. Evid. 702 and 703), his conclusions and opinions may be admissible under Fed. R. Evid. 706 (Court Appointed Experts).  *Id.* at 327 (holding that "the conclusions and opinions of the Examiner are admissible as expert opinion and the balance of the Report is inadmissible hearsay.").  Rule 703 provides,

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type

Batson's   reports   extensively   examined   Defendant's

reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Even if the facts are inadmissible hearsay, Judge Brown noted that an examiner's report can have great value as a resource to aid the parties "in identifying assets of the estate, evaluating a plan or reorganization, or describing likely and legitimate areas for recovery." *Id*. The examiner acts "as an objective nonadversarial party who will review the pertinent transactions and documents, thereby allowing the parties to make an informed determination as to their substantive rights." *Id*. Indeed, "if bankruptcy courts were unable to consider the findings and recommendations of an examiner's report, the process of appointing an examiner would be an exercise in futility." *Id*. at 325.

With respect to Enron's bankruptcy, this Court notes that Neal Batson, a partner in Alston & Bird, LLP, nominated to serve as Enron's court-appointed Bankruptcy Examiner by United States Trustee Carolyn Schwartz and appointed by Judge Gonzalez is an eminently qualified expert in bankruptcy and reorganization law. Nationally recognized as one of the country's top bankruptcy practitioners, he earlier served as the court-appointed examiner in the Chapter 11 case of Southmark Corporation, a real estate and financial services conglomerate with more than $8.5 billion in assets. Among his numerous professional affiliations, he served as chairman of the American College of Bankruptcy since 2001, served as a member of the National Bankruptcy Conference, is a fellow of the American College of Trial Lawyers, was a former vice chairman of the Business Bankruptcy Committee of the American Bar Association's Section on Business Law, by appointment of the Chief Justice of the U.S. Supreme Court served as a member from 1993-1999 of the Advisory committee on the Rules of Bankruptcy Procedure of the Judicial Conference of the United States, is a panel member of the Register of Mediators for the U.S. Bankruptcy Court for the Southern District of New York, and was formerly president of the Atlanta Bar Association. *See* "U.S. Trustee Selects Neal Batson as Examiner in Enron Corp. Bankruptcy Case," U.S. Trustee Program/Dept. of Justice Press Release (May 22, 2002), available at http://www.usdoj.gov/ust/eo/public_affairs/press/docs/pr_enron_ex aminer052202.htm. The Court concludes that his opinions are admissible; indeed his much praised multi-volume report is part of the record in *Newby* and has been relied upon by numerous parties and the Court.

participation in Enron's fraud, including the prepay transactions,
and Plaintiffs insist that they raise fact issues relevant to
Plaintiffs' claims, including causation.  Exhibit 60 to #112 is
Appendix E to the Third Interim Report addressing JPMorgan Chase's
transactions ("the Batson Report").  Batson concluded that
Defendant was aware that the prepays were the equivalent of debt
and that other users of the financial statements would be unable
to see through Enron's accounting treatment the impact of the
Mahonia transactions, which Batson determined had a material
effect on Enron's financial statements.[22]  Batson provided

---

[22] Plaintiffs quote some key passages reflecting Batson's
conclusions, which he based on evidence that is detailed in his
report:

> JPMorgan Chase came to understand and expect
> that Enron would repeatedly rely on financial
> statement management techniques, such as those
> associated with the Mahonia transaction, to
> satisfy its need for cash while simultaneously
> improve the reported results of its
> operations.  (#112, Exh. 60 at 16)

> JPMorgan Chase was aware that the Mahonia
> Transactions were effectively debt.  JPMorgan
> Chase described prepays as loans to bank
> regulators, and in numerous internal written
> and oral communications extending over many
> years, JPMorgan Chase acknowledged that these
> financing transactions were the equivalent of
> debt.  Many of these communications simply
> refer to prepay transactions as "loans" or the
> equivalent of "loans" or "debts." (*id.* at 21)

> There is evidence that JPMorgan Chase
> understood that creditors and other users of
> Enron's financial statements would not be able
> to discern the impact of the Mahonia
> Transactions. (*id.* at 49)

> There is sufficient evidence for a fact-finder
> to conclude that JPMorgan Chase knew why Enron
> wanted to enter into the Mahonia Transactions-
> -to manipulate Enron's financial statements
> using the "results" of those transactions,

documentary and expert evidence to support his opinions:
Plaintiffs cite, in addition to Batson's Report, Exhibits 27; 28;
A at 31, 32, 34, and 107; Exhibits 7; 18; Exhibit B at 847-48,
820-21; Exhibit C at 80; Exhibit F at 86-88, 101-02, 121-22;
Exhibit D at 177-89, 344-59, 278-83, 303-07, 337, and 344; Exhibit
E at 71-72; and pages in Batson's report.  Plaintiffs' expert Paul
Regan agreed with Batson that there were fact issues as to whether
Defendant knowingly aided Enron in understating its debt,
inflating Enron stock prices, and misrepresenting financial
information.  #105 at 19 and Exs. E and F.

### G.  Defendant's Surreply (#113)

Defendant insists that the answer to the single issue
here, i.e., whether there is evidence raising a triable issue of
fact as to whether JPMorgan Chase proximately caused Plaintiffs'
loss, is "No."

Defendant maintains that Plaintiffs have presented no
evidence showing that the alleged conspiracy, i.e., the
transactions that JPMorgan Chase engaged in with Enron, was the
proximate cause of Plaintiffs' losses.  Plaintiffs have only shown
that JPMorgan Chase had knowledge of and participated in certain
prepay and other transactions with Enron.  None of Plaintiffs'
experts have opined whether Plaintiffs' losses were **proximately
caused by** Enron's accounting for JPMorgan Chase's transactions;

---

even though the results were derived from
structures designed to hide their true
meaning. (*id.* at 58

Because of the magnitude of the Mahonia
Transactions, they had a material effect on
Enron's financial statements.  (*id.* at 27.)

they only opine about accounting and structured finance and the nature and purpose of the disputed transactions.

Defendant further insists that Examiner Batson's opinions about those transactions are not admissible,[23] and even if they were, they do not address whether Defendant's transactions with Enron caused Plaintiffs' losses.

Defendant argues that Plaintiffs provide hundreds of pages detailing JPMorgan Chase's transactions with Enron that in no way relate to causation, but only to other elements of Plaintiffs' causes of action such as a "meeting of the minds," a

---

[23] Defendant points out that Batson was not proffered or designated by Plaintiffs as an expert, and that even if he had been, there is no mention in Batson's reports of Plaintiffs' losses nor evidence or opinion about proximate cause or causes of their losses. This Court agrees that technically Batson's report is not admissible for the truth of its contents because Batson was not designated as an expert by Plaintiffs. Nevertheless, his report has been widely recognized as one of the major and most comprehensive sources of information about the collapse of Enron. Moreover the Court has no doubts that counsel for both parties are familiar with it. The Court believes, in the interests of equity and to insure that this case is decided on the merits, that if they so desire, Plaintiffs should be allowed an extension of time to designate Batson as an expert for whatever relevant evidence it might provide. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)("Neither do we suggest that trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.").

Moreover, as concluded by the court in *In re FiberMark*, to the extent that Batson's reports consist of hearsay (out-of-court statements offered for the truth of the matter asserted), they should be excluded under Fed. R. Evid. 802. *In re FiberMark*, 339 B.R. at 327 (holding that the factual portions of the examiner's report were inadmissible as the "purest sort of hearsay"). JPMorgan Chase also argues that the reports contain conclusions that decide disputed issues that the jury must ultimately resolve, and should be excluded as unduly prejudicial under Rule 403. *Id.* Nor are other documents cited by Plaintiffs relevant to causation: a letter from Manhattan District Attorney Robert M. Morgenthau and Robert Roach's testimony to the Senate Permanent Subcommittee on Investigations for similar reasons, argues Defendant.

"duty to disclose," etc.

Defendant reiterates that under Texas law it is not liable for any loss in the value of Plaintiffs' Enron securities, but only for conspiracy and statutory fraud that Defendant, itself, purportedly participated in, i.e., the prepay and other transactions that it engaged in with Enron, and not for separate conspiracies that Enron may otherwise have engaged in and which JPMorgan Chase knew nothing about and not for Enron's alleged misstatements unrelated to JPMorgan Chase's transactions. According to JPMorgan Chase, Plaintiffs erroneously argue that if a party is shown to be a member of one conspiracy, it has also been shown to be a member of all conspiracies involving Enron. There was clearly no meeting of the minds or agreed upon course of conduct with regard to any other transactions or business activities with other financial institutions.[24] Defendant insists that Texas law limits the scope of Plaintiffs' conspiracy claim to only those alleged misstatements of which JPMorgan Chase was aware. *Riquelme Valdes v. Leisure Res. Group, Inc.*, 810 F.2d 1345, 1350-51 (5th Cir. 1987)(for civil conspiracy "[t]he evidence must 'clearly establish the singular intent to defraud by each party, the common knowledge by all parties that each has such intent . . . .'"), *citing Guynn v. Corpus Christi Bank & Trust*, 589 S.W. 2d 764, 771 (Tex. Civ. App.--Corpus Christi 1979, writ

---

[24] The Court notes that these questions are beyond the focus of Defendant's motion for summary judgment, i.e., they relate to elements outside of proximate causation.

dismissed).[25]

Moreover, rather than facilitate Enron's demise, Defendant contends that its prepay transactions provided Enron with much-needed cash in the latter half of 2001.  Furthermore the prepay transactions were reported in press reports critical of Enron's accounting only after Enron filed for bankruptcy; therefore the decline in Enron's securities prices could not have been caused by a curative disclosure relating to these transactions.[26]

Second, Defendant objects to the vast scope of the alleged scheme, which would encompass any conceivable misstatement by Enron, even in connection with failed businesses and transactions that have nothing to do with JPMorgan Chase. Defendant contends that Texas statutory and common law bar Plaintiffs from bringing claims based on purported misstatements

---

[25] This proposition, "common knowledge by all parties that each has such intent" to defraud, must be read in the context of (1) Texas cases that have held that a conspirator need not know other conspirators, other acts on behalf of the object or course of the agreement, what went before he joined the conspiracy, or after his participation in the conspiracy, and (2) the long-established imposition of joint and several liability that may be imposed on as few as one co-conspirator upon a finding of conspiracy to defraud in Texas.

[26] Defendant argues that Plaintiffs cannot recover damages without evidence of proximate causation even if they could show an underlying conspiracy.  *THPD, Inc. v. Continental Imports, Inc.*, 260 S.W. 3d 593, 604 (Tex. App.--Austin 2008)(failure to prove damages in connection with a conspiracy claim precludes recovery even if the underlying conspiracy were proven).
    This Court dismisses this argument since Defendant's motion was clearly and expressly limited to causation.  Moreover, in *THPD*, at trial the jury was erroneously not asked to find the amount of damages proximately caused by the alleged conspiracy. Here, at the summary judgment stage, Defendant's motion has not raised an issue about damages either.

or acts by Enron or other third parties of which JPMorgan Chase
is totally unaware.  Defendant contends that Plaintiffs present
no evidence to support their allegations that Defendant had
knowledge of, or involvement in, the vaguely alleged scheme to
cook Enron's books.

Under the express terms of section 27.01(d), to hold
JPMorgan Chase liable, it contends, Plaintiffs must show that it
"ha[d] actual awareness of the falsity of [the] representation or
promise."  Plaintiffs do not even allege, no less provide
evidence, that JPMorgan Chase had actual awareness of the falsity
of *any* misrepresentation by Enron in connection with transactions
other than JPMorgan Chase transactions or in connection with
Enron's unrelated failed business.  Thus the scope of Plaintiffs'
statutory claim is also limited to Enron's accounting for JPMorgan
Chase's transactions.

## H.  The Court's Decision

1.  Statutory Fraud Claim

Because Defendant has not challenged Plaintiffs' claim
that Enron was a primary violator of § 27.01, this Court, for
purposes of the motion for summary judgment only, presumes that
they have adequately alleged and have evidence to show that it
was.  Plaintiffs have asserted that they relied upon Enron's
misrepresentations and those of the rating agencies that were also
deceived by Enron.

The Court agrees with Plaintiffs that they do not need
to also show that they were defrauded by secondary-violator
JPMorgan Chase's transactions or misrepresentations because the
secondary violation claim is based on Defendant's wrongful

silence.  Plaintiffs have produced evidence that JPMorgan Chase officers had actual awareness of the falsity of Enron's financial reports with regard to JPMorgan Chase's transactions, that it failed to disclose the misrepresentations, and that it benefitted from that undisclosed falsity through increased business and fees[27] from Enron as well as promises of future business.  Moreover as held in *Glazener v. Jansing,* No. 03-02-00796-CV, 2003 WL 22207226, at *5, under the express language of section 27.01(a), (b) and (d) a person who knows of another's misrepresentations, fails to disclose them to the person defrauded, and benefits therefrom can be liable for both actual and exemplary damages.  *Id.* (section 27.01(d) states that a person who knows of the other person's misrepresentation, remains silent, and benefits from it commits the fraud described in section 27.01(a); section 27.01(b) states that a person who commits the fraud described in section 27.01(a) is liable for actual damages; and section 27.01(d) provides for exemplary damages against a person who knows of, fails to correct and benefits from another's misrepresentations).

Plaintiffs have submitted evidence demonstrating that Plaintiffs' injury was foreseeable:  a person of ordinary intelligence would have anticipated that investors would be lured into purchasing Enron securities at an artificially inflated price based on Enron's deceptive financial statements and would subsequently suffer losses when the fraud was uncovered. Plaintiffs also provided evidence suggesting that JPMorgan Chase's

---

[27] Plaintiffs' Expert William Purcell reported, "Fees paid to JPMorgan Chase by Enron and its affiliated entities in 1999 and 2000 were approximately $30.1 million and $29.8 million, respectively."  Ex. C at 24, ¶ 42, to #105.

wrongful silence about Enron's misrepresentations of its multi-
million transactions with Enron was such that reasonable men could
regard it as a cause of Plaintiffs' damages.

The Court, on the record before it in this action,
agrees with JPMorgan Chase's contention that its liability under
section 27.01 is limited to Enron's misrepresentations about
transactions involving JPMorgan Chase because Plaintiffs have not
presented evidence showing that JPMorgan Chase was "actually
aware" of accounting misrepresentations by Enron involving
fraudulent transactions with other banks or institutions,
including those which Plaintiffs have sued in other suits. Rather
they have only provided evidence that JPMorgan Chase had actual
awareness of those misrepresentations about its own involvement
with Enron. Nor have Plaintiffs differentiated the damages caused
to Plaintiffs by Enron's misrepresentations of financial
transactions with JPMorgan Chase, of which JPMorgan Chase had
actual awareness but remained silent and profited, from the
damages allegedly caused by Enron's misrepresentations of
transactions with other parties in similar roles. Under Texas law
however, "There can be more than one proximate cause of an
event." *Olson*, 980 S.W. 2d at 893; *see also Travis v. City of
Mesquite*, 830 S.W. 2d 94, 98 (Tex. 1995). "Circumstantial
evidence and reasonable inferences therefrom are a sufficient
basis for a finding of causation." *Tompkins*, 202 F.3d at 782.
"Establishing causation requires [only] facts sufficient for the
fact-finder reasonably to infer that the defendants' acts were a
substantial factor in bringing about the injury." *Id., citing
Purina Mills, Inc. v. Odell*, 948 S.W. 2d 927, 936 (Tex. App.-

–Texarkana 1997).   Proximate case is "'a practical test, a test of common experience applied to human conduct.'"   *City of Gladewater*, 727 S.W. 2d at 518.

Defendant concedes that Plaintiffs have shown foreseeability,[28] but argues they have not demonstrated cause in fact to meet the proximate causation requirement.   "Establishing causation requires facts sufficient for a jury to reasonably infer that the defendant['] s acts were a substantial factor in bringing about the injury."   *Flock v. Scripto-Tokai Corp.*, 319 F.3d 231, 137 (5th Cir. 2003)*, citing Tomkins v. Cyr*, 202 F.3d 770, 782 (5th Cir. 2000).   The Court finds that Plaintiffs have presented evidence that Defendant lent Enron over $3.7 billion in the Mahonia prepay transactions that was manipulated to appear to be commodity trades.   They have submitted evidence from which any reasonable man could infer that JPMorgan Chase's transactions with Enron were a material and substantial factor in proximately causing Plaintiffs' injuries.   For example, Plaintiffs' expert witness William Purcell, an investment banker for forty years, reported,

> 72.   If adjustments were made to reported Enron results for both the JP Morgan Chase Prepays and the Citigroup Prepays, then the reported 1999 cash flow from operations (i.e., $1.228 billion) would be reduced by $348 million (the JP Morgan Chase adjustment) and $935 million (the Citigroup adjustment), or by a total of $1.283 billion.   In other words, the 1999 cash flow from operations would really be zero, i.e., the 1999 cash flow from operations would really be zero, i.e., a reduction of 100%!

---

[28] A person of ordinary intelligence would have anticipated the damage that the fraudulent financial reports of purported top Fortune-Five-Hundred Enron would inflict on the marketplace.

73. For 2000, the reported cash flow from operations (_i.e._, $4.779 billion) would be reduced by $981 million _and_ $546 million, respectively, or by a total of $1.527 billion. In other words, the 2000 cash flow from operations would really be $3.252 billion, a reduction of 32.0%

74. As for Enron's total reported debt of $8.152 billion in 1999, if adjustments were made for _both_ the JP Morgan Chase Prepays and the Citigroup Prepays (_i.e._, $1.392 billion and $1.125 billion, respectively), then total adjusted debt would be $10.669 billion, or an increase of 30.9% As for 2000, Enron's total reported debt of $10.229 billion would be adjusted by $2.310 billion and $1.671 billion, respectively, to total $14.210 billion. This increase would be 38.9%

#105, Ex. C at 35, ¶¶ 72-74. See also Report of Professor Anthony Saunders regarding the role of JPMorgan Chase, #105, Ex. A at 23-34.

That portion of Bankruptcy Examiner Neal Batson's Report submitted by Plaintiffs (Ex. 60 to #112), though focusing on the breach of fiduciary duty by some Enron officers and injury to Enron and/or its creditors rather than its securities purchasers, contained relevant conclusions about JPMorgan Chase's role and its "actual awareness" of the effect of its deceptive conduct. After stating the detailed factual basis for his opinion, Batson summarized the conclusions of his report on JPMorgan Chase as follows:

[T]here is evidence that JPMorgan Chase knew: (i) the Mahonia Transactions were loans in economic substance; (ii) Enron entered into the Mahonia Transactions for the purpose of reporting the proceeds of these financings as cash flow from operating activities and the obligation to repay these proceeds as price risk management liabilities; and (iii) the impact of the Mahonia Transactions on Enron's financial condition and results of operations would not be apparent to Enron's other

> creditors, analysts and other third-party
> users of Enron's financial statements. There
> is also evidence that JPMorgan Chase assisted
> Enron in connection with the Mahonia
> Transactions by (i) designing the structure
> specifically for Enron; (ii) lending its own
> funds in all twelve of the transactions; and
> (iii) providing an SPE, Mahonia, to serve as
> the conduit entity that Enron believed was
> necessary to obtain its desired accounting
> treatment.

#112, Ex. 60 at 23. Furthermore, after discussing in detail the

structure of the Mahonia Transactions and the evidence of

JPMorgan's full actual awareness of their purpose and effect,

Batson concluded,

> Given their size and material impact on
> Enron's financial statements, any one of the
> Mahonia Transactions might suffice to support
> a finding that JPMorgan Chase gave
> substantial assistance to Enron's officers in
> their breach of fiduciary duties. In light
> of the frequency with which the Mahonia
> Transactions were consummated, there is
> sufficient evidence for a fact-finder to
> conclude that Enron's repetitive use of the
> prepay structure both prolonged and
> exacerbated the misleading effects of the
> Mahonia Transactions on Enron's reported
> financial statements.
>     Each of the Mahonia Transactions was
> substantial, ranging from $72 million to $650
> million. The Mahonia Transactions had a
> material impact on Enron's financial position
> and operating results. Consistently, the
> Mahonia Transactions were closed near the end
> of an annual or quarterly reporting period.
> At least one Mahonia Transaction was closed
> every year after 1992, until Enron finally
> collapsed, and the full extent of its debt
> was revealed. . . .
>     Under the applicable law of aiding and
> abetting,[29] courts often include, as part of

---

[29] Under Texas law, causation is a necessary element and
composed of the same requirements for the causes of action of
aiding and abetting, fraud, and conspiracy: "To establish
the element of causation, a plaintiff must show that the defendant's
acts or omissions were a cause-in-fact of foreseeable losses. The
defendant's acts or omissions are a cause-in-fact if the plaintiff

the element of substantial assistance, that the harm caused must be a reasonably foreseeable result of the actions of the aider and abettor. In the case of Mahonia Transactions, there is evidence of this element. Each of the transactions was structured to enable Enron to produce materially misleading financial statements, which were disseminated to the public. . . .

*Id.* at 59-60.

To any reasonable man, such an enormous amount of concealed debt had to be a substantial factor in making Enron's financial reports materially misleading and in inducing Plaintiffs to purchase Enron securities at artificially inflated prices, resulting in tremendous losses when the fraudulent accounting was exposed.[30] Moreover, any reasonable man would find that the recommendations to purchase Enron securities from analysts from such a prominent, respected institution would influence investors.

Furthermore, whether something constitutes a proximate cause of an event is a question "of fact particularly within the province of a jury." *Olson*, 980 S.W. 2d at 893. Thus the Court leaves that determination to the jury.

Thus, in sum, Plaintiffs have produced sufficient

_____

can show beyond mere conjecture, guess, or speculation, 'that an act or omission was a substantial factor in bringing about an injury which would not otherwise have occurred.'" *Prospect High Income, Inc, v. Grant Thornton, LLP*, 203 S.W. 3d 602, 618 (Tex. App.–Dallas 2006), *citing Marathon Corp. v. Pitzner*, 103 S.W. 3d 724, 727 (Tex. 2003).

[30] As noted earlier, "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred." *Union Pump Co. v. Allbritton*, 898 S.W. 2d 773, 776 (Tex. 1995).

evidence of proximate causation to raise fact issues for trial on their statutory fraud claim, but they are limited to damages for those misrepresentations by Enron of which they have produced evidence that they were "actually aware," i.e., those of the results of JPMorgan Chase's transactions with Enron.

2.  Civil Conspiracy Claim

Plaintiffs have alleged that Enron conspired with JPMorgan Chase to "cook" Enron's books and conceal its deteriorating financial condition from, and to perpetrate fraud upon, the credit rating agencies and the investing public. Defendant allegedly participated in the conspiracy by devising and executing deceptive transactions, especially the Mahonia prepays, that appeared to be commodity trades but were actually disguised loans, as well as by recommending as "buy" or "strong buy" the purchase of Enron securities in analyst reports and other public pronouncements.

In an effort to narrow its potential liability, JPMorgan Chase erroneously argues that it can only be liable for damages caused by its own actions in the conspiracy.  This Court disagrees.  In *United States v. Spudic*, 795 F. 2d 1223, 1337 (7th Cir. 1986), the Seventh Circuit Court of Appeals commented,

> [I]t is not necessary for each coconspirator even to agree to or actually participate in every step of the conspiracy.  A coconspirator is bound by the overt acts of other coconspirators furthering the conspiracy both before and after being enlisted even though he may not participate in each overt act.  A coconspirator need not be, and often is not, aware of everything being done to further the conspiracy. . . . [C]onspiracies involving elaborate arrangements generally are not born full-grown, but rather mature in successive stages

> as other parties are added who may not know
> all that has gone before.  Nonetheless, these
> new members assume the risk. [citations
> omitted]."

*Id*.  Conspiracy requires that a conspirator have knowledge of the
common purpose or goal, not of every act or participant that
furthers that purpose, that binds that conspirator and makes that
conspirator jointly and severally liable for the damages caused
by that fraud on investors and rating agencies.  JPMorgan Chase
argues it cannot be held liable for Enron's myriad business
failures (e.g., the Dabhol power plant in India or the broadband
business), of which it had no connection or no knowledge.  The
Court disagrees to the extent that Defendant can be held liable
for all acts by co-conspirators in furtherance of the common goal
of the conspirators (here, as defined in the complaint, to "cook"
Enron's books and conceal its deteriorating financial condition
from, and perpetrate fraud upon, the credit rating agencies and
the investing public) even if JPMorgan Chase did not know of the
particular acts or the particular co-conspirator that performed
them.  It cannot be liable for damages caused by acts or omissions
beyond the scope of the conspiracy or by non-co-conspirators.
*THPD, Inc. v. Continental Imports, Inc,.*, 260 S.W. 3d 593, 607-08
(Tex. App.--Austin 2008), *citing and discussing Bentley v. Bunton*,
94 S.W. 3d 561 (Tex. 2002).

Texas law is clear that "if a conspiracy is proven, it
can extend liability in tort beyond the active wrongdoer to those
conspirators who may have merely planned, assisted, or encouraged
the wrongdoer's acts."  *Bentley v. Bunton*, 94 S.W. 3d at 619.
Defendant's knowledge need only be that it is involved in a

conspiracy or scheme to cook Enron's books to conceal Enron's actual financial condition from investors and rating agencies. As noted, "[t]he fact that a conspirator is not present at, or does not participate in, all of the conspiratorial activities does not, by itself, exonerate him." *United States v. Ashley*, 555 F.2d at 467. "[A] changing cast of characters does nothing to lessen the fact of one conspiracy. Once the existence of a common scheme of conspiracy is shown, 'slight evidence is all that is required to connect a particular defendant with the conspiracy.'" *Id.* at 467. The district court in *Ashley* opined, "Further, even if this case does present circumstances of changing and overlapping membership and activities, they were all directed toward a common goal. In such circumstances, 'most courts have found, as we do here, sufficient evidence to uphold a jury verdict reflecting a single conspiracy.'" 555 F.2d at 468.

Although Defendant argues that Plaintiffs must show that JPMorgan Chase's actions, and not the conduct of others, caused the specific damage suffered by Plaintiffs, it is black letter law that there can be more than one proximate cause of Plaintiffs' injuries. *Olson*, 980 S.W. 2d at 893; *Travis*, 830 S.W. 2d at 98. Moreover, because Plaintiffs' injury can be caused by any act(s) by a co-conspirator in furtherance of the conspiracy, JPMorgan Chase, if proven to be a conspirator, is liable whether Plaintiffs' injury was substantially caused by JPMorgan Chase's action(s) or by a co-conspirator's.

Plaintiffs have produced evidence demonstrating that JPMorgan Chase substantially participated in the underlying fraud through the Mahonia prepays and analyst reports, in furtherance

of the conspirators' alleged common goal of misleading the rating agencies and the investing public through fraudulent financial reporting of Enron's financial status.

"Once a conspiracy is proven, each co-conspirator 'is responsible for all acts done by any of the conspirators in furtherance of the unlawful combination.'" *Id.* at 925-26, *quoting* W. Prosser, *Handbook of the Law of Torts* § 46 at 293 (1971), and *State v. Standard Oil Co.*, 130 Tex. 313, 107 S.W. 2d 550, 559 (1937). *In accord Carroll*, 592 S.W. 2d at 926. Moreover, joint and several liability is imposed on all conspirators for actual damages resulting from acts in furtherance of the conspiracy. *Id.* at 925. Texas "does not require the trial court to separately submit each co-conspirators's civil conspiracy damages. When the jury found that liability for a civil conspiracy existed, this finding requires the legal conclusion to impose joint and several liability on the co-conspirators." *Bentley*, 94 S.W. 3d at 619. As noted above, where there is a fact question, the issue of proximate cause is for the jury to determine. *Olson*, 980 S.W. 2d at 893 ("The question of proximate cause is one of fact particularly within the province of a jury, and a jury finding on proximate cause will be set aside only in the most exceptional circumstances."); *Flock v. Scripto-Tokai Corp.*, 319 F.3d 231, 237 (5th Cir. 2003)("Under Texas law, causation generally is a question of fact for the jury.").

Defendant appears to be urging the Court to allot damages according to proportionate fault, i.e., that Defendant should be liable only for those damages caused by its own role in the alleged conspiracy, rather than jointly and severally for

damages caused by Enron and any others who may have joined in the conspiracy to misrepresent Enron's financial condition.

At common law in Texas, joint and several liability was imposed on all members of a civil conspiracy. *Delz v. Winfree*, 80 Tex. 400, 16 S.W. 111, 112 (1891); *Wolf v. Perryman*, 82 Tex. 112, 17 S.W. 772, 775 (1891).  In Texas, as in most states in this country, tort reform legislation greatly modified common law principles.  Chapter 33 of the Texas Civil Practices and Remedies Code Ann. §§ 33.001–.017 (Vernon 1997)(the applicable law), is titled, "Proportionate Responsibility" and addresses numerous issues of comparative fault, including submitting issues to the jury, settlement credits for nonsettling defendants, contribution, and joint and several liability.  Chapter 33 applies to any tort cause of action governed by Texas law.  Gregory J Lensing, *Proportionate Responsibility and Contribution Before and After the Tort Reform of 2003*, 35 Tex. Tech. L. Rev. 1125, 1129 (Summer 2004).[31]  It imposes liability on a defendant found to have committed a tort "only for the percentage of damages found by the

---

[31] Quoting a witness before the House State Affairs Committee on April 4, 1995, Shannon Ratliff, Lensing explains that the legislative history from the 1995 revision indicates that the legislature intended that Chapter 33 be given the widest application:

> I think what we're trying to do [in section 33.03] is make sure nobody continues to read this law as being limited to cases of either negligence or product [sic] that cause personal injury, property damage or death. And that as a matter of fact, it applies to all sorts of causes of action other than those specifically excepted."

Lensing, 35 Tex. Tech. L. Rev. at 1129, *citing* III Scott A. Sherman, *Texas Tort Reform:  The Legislative History at II-121* (1995).

trier of fact equal to that defendant's percentage of responsibility with respect to the personal injury, property damage, death or other harm for which damages are allowed." Chapter 33 identifies two major exceptions: (1) where the percentage of responsibility attributed to a defendant is more that 50% and (2) where the percentage attributed to a defendant is equal to or greater that 15% and the claim arises from the discharging of hazardous or harmful substances into the environment or a toxic tort. In both cases, each liable defendant is liable not only for his own liability, but jointly and severally for the damages recovered by the claimant. Thus a limited form of common law joint and several liability among joint tortfeasors is retained. Tex. Civ. Prac. & Rem. Code Ann. §33.013(a). *See also* Carl David Adams, *The "Tort" of Civil Conspiracy in Texas*, 54 Baylor L. Rev. 305, 314-15 (Spring 2002). Section 33.002(b) identifies thirteen portions of the Penal Code as establishing intentional offenses for which joint and several liability against multiple criminal defendants, rather than proportionate responsibility) is still to be imposed. Civil conspiracy (among other common-law intentional torts) is not included.

The question has arisen whether Section 33.002(b) abolished joint and several liability for members of a civil conspiracy. Adams, *The "Tort" of Civil Conspiracy in Texas*, 54 Baylor L. Rev. at 318-19.[32] Mr. Adams argues,

_____

[32] *See also* Kristopher S. Kaufman, Note, *The Liability Reform Act Subsequent to Field v. Boyer Co.: Sounding the Death Knell of Civil Conspiracy in Utah?*, 2003 Utah L. Rev. 1077, 1077 (2003)(At common law coconspirators are jointly and severally liable "because

The more studied response . . . should be
that section 33.002(b) was merely an attempt
by the Texas Legislature to retain the
features of traditional joint and several
liability of joint tortfeasors (as defined by
the common law) for criminals who
intentionally create injuries or damages to
persons by acting in concert with one another
and was not an attempt to abolish, by
omission, the long-recognized tort or cause
of action of civil conspiracy in Texas law.
. . .

The Texas Supreme Court has consistently
declined to construe statues in a manner to
deprive citizens of common law rights or
causes of action unless the Legislature
clearly expresses that intention in the
statute.   In its recent decision of Cash
America International, Inc. v. Bennett, the
Court explained the process as follows:  "A
statute that deprives a person of a common-
law right 'will not be extended beyond its
plain meaning or applied to cases not clearly
within its purview.'  Abrogating common law
claims 'is disfavored and requires a clear
repugnance between the common law and
statutory causes of action.'"

*Id.* at 319-20.  Applying these rules, Adams notes that "no portion

of Chapter 33 directly states any intention (expressly or by

implication) to abolish the common law cause of action or tort of

civil conspiracy or the vicarious liability[33] it visits on all

---

the law regards civil conspiracy not as an actionable tort, but
rather as a theory of liability.   It is dependent upon the
existence of a tort cause of action.   Using this theory of
liability as a tool, a plaintiff may seek to impose liability not
only on the defendants who directly committed the underlying tort,
but on others whose liability results from concerted conduct or
confederation with the direct defendants.   However, these
principles of civil conspiracy necessarily collide with the
requirements of a full comparative-fault statute, which requires
apportionment of damages among intentional tortfeasors.   Not only
have recent decisions questioned whether comparative-fault statutes
would supersede the common law and require apportionment even among
coconspirators, but others have gone so far as to note that an
action for civil conspiracy may be entirely preempted. [footnotes
omitted]").

[33] Quoting Oliver Wendell Homes ("A conspiracy is a partnership
in criminal purposes"), Adams relies on a recent tort treatise by

members." *Id.* at 320.  As evidence of the continuance of joint
and several (or vicarious) liability for civil conspiracy, Adams
also points out that "most of the recent cases have continued to
apply the established rules of vicarious liability between members
of a civil conspiracy despite the requirements of proportionate
responsibility between ordinary independent tortfeasors mandated
by Chapter 33." *Id.* at 321-22, *citing and discussing In re
Performance Nutrition, Inc.*, 239 B.R. 93, 99, 113 (Bankr. N.D.
Tex. 1999)("Once a civil conspiracy is found, each coconspirator
is responsible for any action in furtherance of the conspiracy
performed by other conspirators.  In other words, each action in
a civil conspiracy is imputed to each coconspirator regardless of
who actually performed the acts."); *Tomkins v. Cyr*, 202 F.3d
770,783 (5th Cir. 2000)("[E]ach of the losing defendants is jointly
and severally liable for the actions of the others because all

---

Professor Dobbs of the University of Arizona, which compares
membership in a civil conspiracy to membership in a partnership and
applies a rule of vicarious liability to both.  54 Baylor L. Rev.
at 316-17, *citing*  Dan B. Dobbs, *The Law of Torts* § 340, at 936
(2000).  Adams observes, "All partners are liable, vicariously,
along with the partnership itself for the tortious acts of any
partner.  Thus when a partner is acting in the ordinary course of
business of the partnership and wrongfully injures another, all
members of the partnership are vicariously liable (as well as the
partnership) for injury to the same extent as the active
partner.[footnotes omitted]" *Id.* at 316-17.  *See also* Kaufman,
Note, 2003 Utah L. Rev. at 1103 (same).
        "[M]any courts use the term 'vicariously liable' rather
than 'jointly and severally liable,' or even use them
interchangeably to reach the same result."  Kaufman, Note, 2003
Utah L. Rev. at 1102, *citing Halberstam v. Welch*, 705 F.2d 472,
477-78 (D.C. 1983), and 15A C.J.S. Conspiracy § 8 ("A civil
conspiracy is only a means for establishing vicarious liability for
an underlying tort, or a means of establishing joint liability for
tortious conduct.").  "[V]icarious liability does not arise from
actual fault as does joint-and-several liability, but rather is the
fault of another that is merely imputed to the vicariously liable
defendant." *Id.* at 1102-03.

were found to be co-conspirators in a civil conspiracy.").

     To this list the Court would add other Texas state court decisions imposing joint and several liability on co-conspirators after the 1995 amendment of Chapter 33: *Bentley v. Bunton*, 94 S.W. 3d 561, 619 (Tex. 2002)("A party who joins in a conspiracy is jointly and severally liable 'for all acts done by any of the conspirators in furtherance of the unlawful combination.'"); *J.T.T. v. Chon Tri*, 111 S.W. 3d 680, 686 (Tex. App.--Houston [1st Dist.] 2003)("[A] finding of civil conspiracy imposes joint and several liability on all co-conspirators for any actual damages that result from the conspiracy."), *reversed on other grounds*, 162 S.W. 3d 552 (Tex. 2005); *Goldstein v. Mortenson*, 113 S.W. 3d 769, 780 (Tex. App.--Austin 2003)("showing of civil conspiracy imposes joint and several liability on all coconspirators for actual damages resulting from conspiratorial acts"); *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W. 3d 56, 90 (Tex. App.--Houston [14th Dist. 2004, no pet.)("A finding of civil conspiracy further imposes joint and several liability on all conspirators for actual damages resulting from acts in furtherance of the conspiracy.").

     Furthermore, "the majority of states do not apply the principles of comparative fault in apportioning damages among intentional tortfeasors," but impose joint and several liability. Kaufman, Note, 2003 Utah L. Rev. at 1091-92, *citing* Allan L. Schwartz, Annotation, Applicability of Comparative Negligence Principles to Intentional Torts, 18 A.L.R. 5th 525, 533 (1994).

     Thus this Court also concludes that joint and several liability for common-law civil conspiracy to defraud was not abolished by Chapter 33.  Moreover, it concludes that Plaintiffs

have presented sufficient evidence, discussed *supra* with respect to statutory fraud, to survive Defendant's motion for summary judgment.

3.   Expert Testimony

As with the element of causation, Texas law about the necessity of expert witnesses is far less demanding than that of federal securities law.  Plaintiffs do have experts addressing the complex accounting performed by Enron.  The Court agrees with Plaintiffs that a lay jury could, without the further help of experts, find that the purchasers of Enron securities who bought them at artificially inflated prices because of repeated, deceptive financial reports by Enron to the SEC and by Defendant's analysts, would experience losses when Enron's actual financial condition was revealed.  Moreover, as discussed, Plaintiff has provided expert reports concluding that JPMorgan Chase's acts and omissions were a substantial cause-in-fact of Plaintiffs' foreseeable losses.

4.   Conclusion

For these reasons the Court denies JPMorgan Chase's motion for summary judgment, based on causation, but limits the potential liability of the statutory fraud claim to damages caused by those misrepresentations of Enron about which Plaintiffs have shown JPMorgan Chase was actually aware, i.e., misrepresentations arising out of Defendant's transactions with Enron.

**II.   Plaintiffs' Motion for Trial Setting (#72) and Plaintiffs' Motion for Status Conference (#133)**

Having resolved the motion for summary judgment, the Court grants these motions so this action can proceed.

### III.  Defendant's Motion to Compel (#116)

### A.  Parties' Contentions

Pursuant to Fed. R. Civ. P. 26(e),[34] Defendant seeks production of settlement agreements which Plaintiffs have entered into with defendants sued in separate civil actions, in each of which Plaintiffs have alleged that the set of defendants was fully responsible for the losses Plaintiffs sustained as a result of Enron's bankruptcy,[35] along with related documents.[36]  Not only do

---

[34]  Rule 26(e) ("Supplementing Disclosures and Responses") provides in relevant part,

> *(1) In General*.  A party who has made a disclosure under Rule 26(a)--or who has responded to an interrogatory, request for production, or request for admission--must supplement or correct its disclosure or response:
>
> **(A)** in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
>
> **(B)** as ordered by the court.

JPMorgan originally requested "All Documents relating to Plaintiffs' gains and losses from their investment in any Enron-related Securities, Investments or Contracts . . . ."  #118, Youngwood Affidavit, Ex. 2 (JPMorgan Chase's First Set of Requests for Production of Documents), Request 9.

[35] Defendant asserts that based on Court filings, it believes Plaintiffs have entered into settlement Agreements with Canadian Imperial Bank of Commerce, CIBC, Inc., CIBC World Markets Corp., Citigroup Inc., Citigroup Global Markets Inc. (f/k/a Salomon Smith Barney Inc.), James P. Reilly, Jr., Credit Suisse First Boston, Inc., Credit Suisse First Boston LLC, Credit Suisse First Boston (USA), Inc., Pershing LLC, Lehman Brothers Holding, Inc., Lehman Brothers, Inc., Lehman Brothers Commercial Paper, Inc., John Pruser, Certain Outside Directors (Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, John H. Duncan, Joe H. Foy, Wendy L. Gramm, Robert J. Jaedicke, Charles A. LeMaistre, John Mendelsohn,

federal district courts routinely order production of settlement
agreements that are relevant to a claim or defense of a party,[37]
but these particular non-privileged settlement agreements are
relevant and necessary to determine the amount of settlement
credits to which JPMorgan Chase is entitled under Texas' common-
law "one satisfaction" rule that a plaintiff should not be
compensated twice for the same injury[38] and under Tex. Civ. Prac.
& Rem. Code Ann. § 33.012(b)("the court shall [] reduce the amount
of damages to be recovered by the claimant with respect to a cause
of action by the sum of the dollar amounts of all settlements").[39]

---

Jerome Meyer, Frank Savage, John Urquhart, Charles E. Walker, and
Herbert Winokur, Jr.), Ken L. Harrison, Rebecca Mark-Jusbasche,
Paulo Ferraz Pereira, and John Wakeham.

[36] The related documents are any documents showing (i) the
consideration Plaintiffs were given in exchange for releasing their
claims, (ii) the duties or obligations of the parties under the
settlement agreements, and (iii) Plaintiffs' recovery of money
related to their Enron-related losses.  #118, Youngwood Affidavit
Ex. I.

[37] *See, e.g., White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D.
364, 366-67 (N.D. Ill. 2001)("Courts have allowed discovery of
settlement documents in order to allow parties to ascertain the
extent of their liability"); *Collins v. Coastline Constr., Inc.*,
No. 92-16, 1992 WL 125328, *3 *E.D. La. May 25, 1992); *Bennett v.
La Pere*, 112 F.R.D. 136 (D.R.I. 1986)..

[38] *See, e.g., Stewart Title Guar. Co. v. Sterling,* 822 S.W. 2d
1, 8 (Tex. 1991)(when a claimant seeks recovery for the same
injuries from multiple parties, the claimant is entitled to only
one recovery for those injuries).  Section 33.012 of the Tex. Civ.
Prac. & Rem. Code supports this rule by requiring the court to
reduce the damages a claimant recovers from its settlements with
other defendants.

[39] Defendant notes that under the version of Chapter 33 in
effect when this action was filed on March 27, 2002, as an
alternative to a settlement credit defendants may elect to reduce
the amount of damages by a dollar amount equal to the sum of the
following percentages of damages found by the trier of fact:  5% of
those damages up to $200,000; 10% of those damages from $200,001 to
$400,000; 15% of those damages from $400,000  to $500,000; and 20%

Defendant further argues that these documents are relevant and necessary to the evaluation of the probative value of potential trial testimony of Settling Defendants called as witnesses at trial by JPMorgan Chase to aid the jury's apportioning of responsibility among Settling Defendants under Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a). *See, e.g., In re Frank A. Smith Sales*, 32 S.W. 3d 871, 874-76 (Tex. App.--Corpus Christi 2000)(settlement agreements are deemed relevant and subject to disclosure where a defendant must elect its settlement credit under Chapter 33 of the Tex. Civ. Prac. & Rem. Code before trial and where the agreements relate to bias or credibility of potential witnesses); *In re CFS-Related Sec. Fraud Litig.*, No. 99-CV-825-L(J), 2003 WL 24136089, *3 (N.D. Okla. July 31, 2003)("The clear majority of cases relied upon by the parties hold that settlement agreements are discoverable with regard to the issues of witness bias and credibility."). Defendant further maintains that equities favor disclosure of the documents.

In response, Plaintiffs claim that all the settlement agreements at issue have confidentiality provisions. Strong federal policy supports settlement of cases, and the confidentiality of settlement agreements is a primary inducement to the parties to settle a case. *Centillion Data System, Inc. v. Ameritech Corp.*, 193 F.R.D. 550, 551-52 (S.D. Ind. 1999). "Where private parties, represented by counsel, contract for confidentiality of the settlement agreement terms, courts should

---

of those damages greater tan $500,000. Tex. Civ. Prac. & Rem. Code Ann. § 33.012(b)(2)(Vernon 1997). *See also Mobil Oil Corp. v. Ellender*, 968 S.W. 2d 917, 926 (Tex. 1998).

be loathe to interfere." *EEOC v. Rush Prudential Health Plans*, No. 97 C 3823, 1998 WL 156718, *5 (N.D. Ill. Mar. 31, 1998)("Where private parties, represented by counsel, contract for confidentiality of the settlement agreement terms, courts should be loathe to interfere.").

Plaintiffs state that they have provided JPMorgan Chase with the dollar amount of the total recovery from the settlements and have offered to provide an affidavit attesting to the accuracy of that total amount, for purposes of the "one satisfaction" rule. They have also filed under seal (#123) an affidavit of their attorney, Andrew Mytelka, specifying facts about these agreements to support Plaintiffs' request that the motion be denied. Plaintiffs emphasize that Defendant fails to explain why that aggregate figure is insufficient or to specify what additional facts in the settlement agreements would aid Defendant in determining its liability under the "one satisfaction" rule or chapter 33. Alternatively, Plaintiffs suggest that the Court review the agreements *in camera* to determine if disclosure of only the aggregate settlement amount is sufficient to establish a settlement credit or offset. They further argue that Defendant's request is premature, since a settlement agreement is not admissible at trial to prove liability or damages. Fed. R. Evid. 408; *Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 2001 U.S. Dist. LEXIS 8200, *3-4 (S.D.N.Y. June 21, 2001)("The defendants . . . argue that they are entitled to review the agreement because any financial settlement will reduce damages recoverable from the non-settling defendants. While that fact will make the agreement discoverable after trial, it does not make

it relevant now."); *Bottaro v. Hatton Assocs.*, 96 F.R.D. 158, 160 (E.D.N.Y. 1982)(Even after final judgment, "the settlement would not be evidence relevant to any issue in this case other than the ministerial apportionment of damages. . . . Hence, the amount of settlement is not relevant to any issue in this case at this time.").  In addition, Plaintiffs maintain that nothing in the settlement agreements and related documents could be used to impeach any potential witness and that Defendant is merely speculating that provisions of the agreements might provide information about witness bias or credibility and is seeking a fishing expedition.[40]

In reply, after reiterating earlier arguments, JPMorgan Chase points out that none of the cases cited by Plaintiffs relate to Texas' "one satisfaction" rule or to Chapter 33 or to the bias and credibility of potential witnesses.  Instead their cases reject efforts to use settlement agreements to show liability or damages (barred by Fed. Rule of Evid. 408(a)) and/or seek settlement agreements to determine **contribution**, an issue not ripe until after a final judgment has been rendered.  These cases have no bearing on the issue before this Court, i.e., reduction of damages as determined under Chapter 33 and the "one satisfaction" rule.  Chapter 33 requires that defendants elect to reduce damages by settlement amounts **prior** to trial.  *In re Frank A. Smith Sales*, 32 S.W. 3d at 875-76 (ordering production of settlement agreements at issue prior to trial because defendant "cannot present its 'one

---

[40] As examples of such information not present in the agreements at issue, Plaintiffs suggest promises of future cooperation or testimony and admissions on the part of the settling defendant.  #122 at 9.

satisfaction' claim and its entitlement to a settlement credit [under Chapter 33] without discovery of the settlement agreements."). Therefore discovery is not premature.

### B. Court's Ruling

Although under Federal Rule of Evidence 408, settlement agreements are not admissible at trial to prove liability, state and federal courts have held that settlement agreements are discoverable to the extent that they are relevant. *See, e.g., Ford Motor Co. v. Leggat*, 904 S.W. 2d 643, 649 (Tex. 1995); *Young v. State Farm Mut. Auto Ins. Co.*, 169 F.R.D. 72, 79 (S.D.W. Va. 1996); *Doe v. Methacton Sch. Dist.*, 164 F.R.D. 175, 176 (E.D. Pa. 1995); *Vardon Golf Co., Inc. v. BBMG Golf, Ltd.*, 156 F.R.D. 641, 650-51 (N.D. Ill. 1994); *Fidelity Fed. Sav. & Loan Ass'n v. Felicetti*, 148 F.R.D. 532, 534 (E.D. Pa. 1993); *Morse/Diesel Inc. v. Trinity Indus.*, 142 F.R.D. 80, 85 (S.D.N.Y. 1992); *Bennett v. La Pere*, 112 F.R.D. 136 (D.R.I. 1986).

For purposes of discovery, relevancy is construed liberally to reach "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Federal Rule of Civil Procedure 26(b)(1), which governs pretrial discovery, states in relevant part:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense--including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter

> relevant to the subject matter involved in
> the action.  Relevant information need not be
> admissible at the trial if the discovery
> appears reasonably calculated to lead to the
> discovery of admissible evidence. . . .

Confidentiality clauses in private settlement agreements cannot preclude a court-ordered disclosure pursuant to a valid discovery request.  *See, e.g., In re Continental Ins. Co.*, 994 S.W. 2d 423, 425 (Tex. App.--Waco 1999), *mandamus granted*, *In re Union Pacific Resources Co.*, 22 S.W. 3d 338 (Tex. 1999)(rehearing overruled), *remanded to In re Continental Ins. Co.*. 20 S.W. 3d 776 (Tex. App.--Waco 2000)("Individuals cannot protect relevant information from discovery by confidentiality provisions in contracts, even settlement agreements.  The private agreement between two individuals does not override the discovery rules."); *Griffin v. Mashariki*, No. 96 Civ. 6400 (DC), 1997 WL 756914, *2 (S.D.N.Y. Dec. 8, 1997)("[T]he mere fact that settling parties agreed to maintain the confidentiality of part of the settlement . . . cannot serve to shield that statement from discovery"); *Tribune Co. v. Purcigliotti*, No. 93 Civ. 72222 (LAP)(THK), 1996 WL 337277, *3 (S.D.N.Y. June 19, 1996)(same proposition); *Magnaleasing, Inc. v. Staten Island Mall*, 76 F.R.D. 559, 562 (S.D.N.Y. 1977)(confidentiality clause does not bar discovery of relevant portions of a settlement agreement).

Knowledge of settlement amounts by other defendants allegedly responsible for the same injury is relevant to determine any offset a defendant might have under the "one satisfaction" rule and/or Chapter 33.  A defendant seeking such a settlement credit has the initial burden of proving its right to such a credit by placing the settlement agreement or some evidence of the

settlement amount in the record. *Ellender*, 968 S.W. 2d at 927 (Because Chapter 33 does not indicate which party must establish the settlement amount, the Texas Supreme Court has turned to common law, which requires only that the record show the settlement credit amount in a settlement agreement or otherwise.), *citing First Title Co. v. Garrett*, 860 S.W. 2d 74, 78 (Tex. 1993); *Utts*, 81 S.W. 3d at 828. To obtain a dollar-for-dollar credit under Chapter 33, a defendant must submit a written election **before** the case is submitted to the factfinder. *Id.*, citing § 33.014; *Utts v. Short*, 81 S.W. 3d 822, 828 (Tex. 2002). Thus the Court disagrees with Plaintiffs' argument that the motion to compel is premature.[41] *Ellender*, 968 S.W. 2d at 927; *Utts v. Short*, 81 S.W. 3d at 828.

Nevertheless, "[u]nder *Ellender*, the settlement credit can be established by the actual 'settlement agreement or some other evidence of the settlement amount.'" *Borg-Warner Corp. v. Flores*, 153 S.W. 3d 209, 221 (Tex. App.--Corpus Christi 2004)(citing *Ellender*, 968 S.W. 2d at 927)), *rev'd on other grounds*, 232 S.W. 3d 765 (Tex. 2007). Once the nonsettling defendant establishes a right to a settlement credit, the burden shifts to the plaintiff to demonstrate that certain amounts should

---

[41] The Court points to *In re Continental Ins. Co.*, 994 S.W. 2d at 426-27 ("There is no procedure in Texas that allows for the discovery of information related to damages, including an offset, only after a finding of liability. Evidence of damages, other than punitive damages must be presented to the fact finder during the case-in-chief. There is simply no process that allows either party to recess the trial once a liability determination has been made, so that they can then engage in discovery related to damages. Thus there is no basis in the law for the arguments made by [non-movant] to delay the production of information until after liability has been established. [citations omitted]").

not be credited because of the settlement agreement's allocation between damages for which the settling and nonsettling defendants are jointly liable and damages for which only the settling party is liable. *Ellender,* 968 S.W. 2d at 928; *Crown Life Ins. Co. v. Casteel*, 22 S.W. 3d 378, 392 (Tex. 2000); *Oyster Creek Financial Corp. v. Richwood Investments II, Inc.*, 176 F.3d 307, 317 (Tex. App.--Houston [1st Dist] 2004). If the plaintiff cannot meet this burden, the nonsettling defendant is entitled to a credit equaling the entire settlement amount. *Ellender*, 968 S.W. 2d at 928; *Stewart Title Guarantee Co. v. Sterling*, 822 S.W. 2d 1, 8 (Tex. 1991); *Oyster Creek*, 176 F.3d at 317.

In light of the phrase that a party must "show, in settlement agreement or otherwise," it appears to this Court that the aggregate settlement amount, supported as accurate by affidavit, produced by Plaintiffs may suffice for purposes of Defendant's statutory election and Texas' "one satisfaction" rule. As for bias and credibility, pursuant to Plaintiffs' alternative suggestion, the Court will examine the settlement agreements *in camera* to insure that Defendant is not deprived of any relevant information. Moreover, such a review will reveal whether the aggregate amount submitted by Plaintiffs is correct. If the Court determines the agreements should be disclosed, Plaintiffs may move for a protective order.

### IV.  Court's ORDER

For the reasons explained above, the Court

ORDERS that Defendant's motion for summary judgment (#99) on Plaintiffs' TSA and common-law fraud claims against Defendant is GRANTED. The Court further

ORDERS that JPMorgan Chase's motion for summary judgment on causation as to the statutory fraud and conspiracy claims is DENIED.  Plaintiffs are granted an extension of two weeks from receipt of this order to designate Neal Batson as an expert witness, if they wish to do so. If they move to designate Batson as an expert, at the time that a new schedule is established for this case, the Court will address any requests for additional time to prepare for that expert designation.

In addition the Court

ORDERS that Defendant's motion to compel production of settlement agreements and related documents (#116) is DENIED for the present, as indicated above.  Plaintiffs shall submit the settlement agreements for *in camera* review within ten days, after which the Court will decide whether they should be disclosed to Defendant.

Finally, the Court will issue a separate order addressing the motion for hearing (#72) and the motion for status conference (#133).

**SIGNED** at Houston, Texas, this 1st day of June, 2009.


_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE